# NEW ORLEANS *v.* TEXAS AND PACIFIC RAILWAY COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

No. 1. Argued January 3, 4, 1898. — Decided May 31, 1898.

Where an undertaking on one side is in terms a condition to the stipulation on the other, that is, where the contract provides for the performance of some act, or the happening of some event, and the obligations of the contract are made to depend on such performance or happening, the conditions are conditions precedent; but when the act of one is not necessary to the act of the other, and the loss and inconvenience can be compensated in damages, performance of the one is not a condition precedent to the performance of the other.

It being shown by the record that the railway terminus from which the extension along Claiborne street was to be made was never constructed; and that the crossing from Westwego to the land in front of the park was also never established, but, on the contrary, that the company extended its road down the river to Gouldsboro, where it made its main crossing, the right to the extension and the right to the use of the batture no longer obtains.

The suspensive condition, by which the rights of the company under the original ordinance were held in abeyance, operates also upon the lease, and the mere payment of rent did not change the nature of the suspensive condition, or work an estoppel.

The ends of justice will be best subserved by not passing upon the third assignment of error, but the rights of both parties in relation thereto may be left open for further consideration in the court below.

THE New Orleans Pacific Railway Company became duly incorporated under the general laws of the State of Louisiana on June 29, 1875.   By Article I, of its charter, it was given corporate existence for the term twenty-five years from that date.   By Article III it was empowered among other things: " To lay, construct, lease, own, and use a railroad with one or more tracks and suitable turntables upon such course or route as may be deemed by a majority of the directors of said company most expedient, beginning at a point on the Mississippi River at New Orleans, or between New Orleans and the parish of Iberville, on the right bank of the Mississippi, and Baton Rouge on the left bank, or from New Orleans or Berwick's Bay via Vermilionville, in the parish of Lafayette, and Opelousas, in the parish of St. Landry, or from any of said points, or from any point within the limits of this State, and running thence toward and to the city of Shreveport, or the city of Marshall or Dallas, in the State of Texas, in such direction and route or routes as said company shall fix, and with such connecting branches in the State of Louisiana as may be deemed proper ; to locate, construct, lease, own, maintain and use such branch railroads and tracks as the majority of the directors of said company may from time to time deem proper and expedient and for the interest of said company to own and to use, and lease, with the right to connect their main line with any other line or lines in other States, which shall authorize the exercise of said privilege within their limits ; to establish and maintain in the city of New Orleans proper freight and passenger depots, and to connect them by tracks and ferries with the left bank of the Mississippi River, at such point or points as may be deemed most convenient for the public interest, and to use in such ferries, steamboats and other vessels, and for the purposes of such depots, tracks and ferries to acquire property by expropriation ; to acquire, construct, maintain and use suitable wharves, piers, warehouses, yards, steamboats, harbors, depots, stations and other

works and appurtenances connected with and incidental to said railway and its connections, and to run and manage the same as the directors of the said company may deem to be most expedient and to the welfare of said corporation; to construct and maintain its said railroads, or any part of the same, and to have the right of way therefor across or along or upon any waters, water courses, river, lake, bay, inlet, street, highway, turnpike or canal within the State of Louisiana which the course of said railways may intersect, touch or cross, provided that said company shall preserve any watercourse, street, highway, turnpike or canal which its railways may so pass upon, along or intersect, touch or cross, so as not to impair its usefulness to the public unnecessarily; to obtain by grant or otherwise from any parish, city or village within the State any rights, privileges or franchises that any of said parishes, cities or villages may choose to grant in reference to the construction, maintenance, management and use of the railroads of said company, its depots, cars, locomotives and its business within the limits of such or any of said parishes, cities and villages; to purchase or lease from any railroad company or corporation, at any authorized sale, any railroad and the charter, franchises, property and appurtenances thereof and to maintain and use the same as a part of the property of said company."

On February 19, 1876, the General Assembly of the State of Louisiana passed Act No. 14 of 1876, to confirm said charter of the railway company, with amendments thereto, which among other things declared: "That the term of existence of the said New Orleans Pacific Railway Company shall be so extended that said company by its name and under the aforesaid mentioned articles of incorporation, shall have perpetual succession and that Shreveport in Louisiana shall be the northwestern terminus of said New Orleans Pacific Railway Company, and that the main line shall be completed to Shreveport before any branches shall be constructed."

The City Council of New Orleans on November 9, 1880, adopted Ordinance No. 6695, entitled "An ordinance granting to the New Orleans Pacific Railway Company or its

assigns, the right to establish its terminus within the city limits, and to construct, maintain and operate a railroad to and from such terminus with one extension for passenger purposes and another one for freight purposes into and through certain streets and places in the city of New Orleans."

This ordinance read:

" Whereas, the New Orleans Pacific Railway Company, a corporation organized and existing under Louisiana state laws, is vested with authority under an act approved February 19, 1876, as follows, to wit: ' To locate, construct, lease, own and use a railroad, with one or more tracks and suitable turnouts, of such gauge and construction and upon such a course or route as may be deemed by a majority of the directors of said company most expedient,' and to and between the points and places mentioned and implied in said act, and is hereby authorized ' to establish and maintain in the city of New Orleans proper freight and passenger depots,' and to construct wharves, piers, warehouses, yards, depots and stations; and to 'construct and maintain its said railroads or any part of the same, and to have the right of way therefor across and along and upon any street, highway, turnpike or canal in the State of Louisiana which the course of said railways may intersect, touch or cross. Provided the said company shall preserve any street, highway, turnpike or canal which its said railways may so pass upon, along or intersect, touch or cross, so as not to impair its usefulness to the public unnecessarily;' and,

" Whereas it is for the interest of the city of New Orleans that the southern terminus of said railroad shall be fixed and established within the city limits; and,

" Whereas the said New Orleans Pacific Railway Company is desirous of constructing its line of road on the east bank of the Mississippi, from a crossing near Baton Rouge to some point in the city of New Orleans, between the new canal and Melpomene street, and to establish its terminus at such point, on condition that the city shall grant to the company the right to extend its tracks from such terminus into and through Claiborne street to Canal street, for passenger purposes; and

shall also grant the right to extend its tracks from such ter-
minus north of Claiborne street by the most convenient and
practicable route through the public streets to the river front
for freight purposes, with the right to operate the same by
steam or otherwise, as is now done on the Belt railroad on
St. Joseph street, and on the levees by other railroad compa-
nies in the city of New Orleans.

"Now, therefore, for the purpose of permanently securing
to the city of New Orleans the advantages that will result
from locating and maintaining the terminus of the said New
Orleans Pacific Railway within the city limits:

"SECTION 1. Be it ordained by the Council of the City of
New Orleans, That the New Orleans Pacific Railway Com-
pany be, and it is hereby, authorized and empowered to locate,
construct and maintain a railroad, with all necessary tracks,
switches, turnouts, sidings and structures of every kind con-
venient and useful and appurtenant to said railroad, upon lines
and levels to be furnished by the city surveyor, to and from
such point as shall be selected by such company as its termi-
nus, between the new canal, Claiborne canal and Carrollton
avenue, with the right to establish and maintain at such
point necessary depots, shops, yards, warehouses and other
structures convenient and useful for the transaction of its
business, and to operate the same by steam or otherwise for
the transportation of freight and passengers within the city
limits.

"SEC. 2. Be it further ordained, That the said New Orleans
Pacific Railway Company, or its assigns, be and they are
hereby authorized and empowered to locate, construct and
maintain an extension of its railroad, with all necessary tracks,
switches, turnouts, sidings and structures of every kind con-
venient and useful and appurtenant to said railroad, upon
lines and levels to be furnished by the city surveyor, into and
through Claiborne street to Canal street, with the right to
construct a passenger depot at or near the intersection of
Claiborne street with Canal street; and to operate the same
by steam or otherwise for the transportation of passengers;
Provided, That should it become necessary for the building of

depot or laying of tracks to remove the Claiborne market, then the said New Orleans Pacific Railway Company obligate themselves to rebuild the same at their own expense on such lots to be purchased by the company as the city shall designate. The said market to be rebuilt under the supervision and instructions of the administrator of waterworks and public buildings.

" Sec. 3. Be it further ordained, That the said New Orleans Pacific Railway Company, or its assigns, be and they are hereby, authorized and empowered to locate, construct and maintain an extension of its railroad, with all necessary tracks, switches, turnouts, sidings and structures of every kind, convenient and useful and appurtenant to said railroad upon lines and levels to be furnished by the city surveyor, across Claiborne canal into and through such street as may hereafter be lawfully selected to the river front, with the right to extend its tracks through Front street, Water and Jackson streets, connecting with the depots of the Louisville and Nashville Railroad Company, Morgan's Louisiana and Texas Railroad, and the Chicago, St. Louis and New Orleans Railroad, and to operate the same by steam or otherwise for the transportation of cotton, tobacco, grain, merchandise and other freight; or the said company may purchase, lease, control, maintain and operate by steam or otherwise any railway or railway tracks now existing in the streets of the city of New Orleans.

" Sec. 4. Be it further ordained, That the right of way, franchises and privileges herein granted to the New Orleans Pacific Railway Company are granted only on condition and in consideration that the said grantee shall permanently establish the terminus of said road within the city limits and maintain said terminus during the existence of the charter of said company, for which period said right of way privileges shall last, and should the said company at any time hereafter abandon its said road on the east side of the Mississippi River and its terminus within the city limits, then this grant shall cease and terminate, and be without force and effect from the date of such abandonment, and the further condition that all construction work within the city limits shall be executed under

the direction and supervision of the city surveyor and completed to the satisfaction of the administrator of improvements and the administrator of commerce; and it is still further made a condition of this grant that said railway company shall complete its road from the crossing of the Mississippi River, at or near Baton Rouge, to its terminus in this city within two years from the promulgation of this ordinance.

"SEC. 5. Be it further ordained, That the rights herein granted on Claiborne street shall apply only to a railroad for passenger purposes; that the rights to be granted from north of the Claiborne canal to the river front and hereby granted along the river front and in parallel streets, shall apply to a railroad for freight purposes only, and shall not be used as a thoroughfare for the transportation of passengers without consent of this council."

On December 3, 1880, the following ordinance, numbered 6732, was adopted:

"Whereas, on the ninth day of November, 1880, the Ordinance No. 6695 (administration series) was duly adopted, granting to the New Orleans Pacific Railway Company, or its assigns, the right to establish its terminus within the city limits, and to construct, maintain and operate a railroad to and from such terminus; with one extension for passenger purposes and another for freight purposes, into and through certain streets and places in the city of New Orleans; and it was contemplated by said ordinance that a street should be duly selected whereby the said company should have its rights recognized to lay a track from Claiborne street to the river front through a street to be selected; now, therefore,

"SECTION 1. Be it ordained by the City Council of the City of New Orleans, That the New Orleans Pacific Railway Company, or its assigns, be, and it and they are hereby authorized and empowered to locate, construct and maintain an extension of its railroad, with all necessary tracks, switches, turnouts, sidings and structures of every kind, convenient and useful and appurtenant to said railroad, upon lines and levels to be furnished by the city surveyor across Claiborne canal, into and through Thalia street, to the river

front, and to operate the same by steam or otherwise for the transportation of cotton, tobacco, grain, merchandise and other freight; or the said company may purchase, lease, control, maintain and operate, by steam or otherwise, any railway or railway tracks now existing in the streets of the city of New Orleans; provided, that there shall be but one track laid on Thalia street, from Claiborne to Water street.

" SEC. 2. Be it further ordained, That the right of way, franchises and privileges herein granted to the New Orleans Pacific. Railway Company are granted only on condition and in consideration that the said grantees shall permanently establish the terminus of said road within the city limits, and to maintain said terminus during the existence of the charter of said company, for which period said right of way and privileges shall last; and should the said company at any time hereafter abandon its said road on the east side of the Mississippi River and its terminus within the city limits, then this grant shall cease and terminate and be without force or effect from the date of such abandonment; and upon the further condition that the said company, at the time of laying their track upon Thalia street, shall pave said street, from Pilie street to Rampart street, including all intersections of said Thalia street, with blocks of the best hard Boston granite, oblong in shape, not less than eleven inches and not more than fourteen inches in width, and not less than sixteen inches nor more than twenty-four inches in length, and from nine to ten inches in thickness; they shall be well quarried, having parallel sides and ends, and the upper side free from lumps. The blocks adjoining the gutterstones shall be cut at an angle of forty-five degrees with the sides, so as to be laid diagonally, and said pavement shall extend from curb to curb; and the said company shall at the time of laying their track pave with round or cobblestone pavement, laying with gutterstones the gutters of said street, from the end of the block paving at Rampart street to Claiborne street, with the privilege of using for the pavement the cobblestones removed from that part of the street to be paved with square block — the rails to be laid in the pavement so that the top of the rails shall be flush with the

surface of the pavement; and upon the further condition that said railway company shall at all times keep said pavement from curb to curb in repair; and the further condition that all construction work within the city limits shall be executed under the direction and supervision of the city surveyor and completed to the satisfaction of the administrator of improvements and the administrator of commerce; and it is still further made a condition of this grant that said railway company shall complete its road from the crossing of the Mississippi River, at or near Baton Rouge, to the terminus in this city, within two years from the promulgation of this ordinance.

"Sec. 3. Be it further ordained, That upon the failure of said company to comply within three days with any notice of the department of improvements to repair any portion of the street or streets through which said company shall lay its tracks, they shall be fined twenty-five dollars for each and every day they fail to comply with said notice; said fine to be recoverable before any court of competent jurisdiction."

In 1881 the New Orleans Pacific Railway Company purchased a railroad already constructed by the New Orleans, Mobile and Texas Railroad Company on the west bank of the Mississippi River, extending from Bayou Goula, a point near Baton Rouge on the west bank, to Westwego, also on the west bank, and just opposite New Orleans. Subsequently on March 29, 1881, the city council passed an ordinance, No. 6938, as follows:

"Whereas the New Orleans Pacific Railway Company has purchased the road heretofore constructed under the charter of the New Orleans, Mobile and Texas Railroad Company, on the west bank of the Mississippi River, between Bayou Goula and Westwego, and with a view to maintaining and operating the said road in connection with and as a part of its through line to and from its terminus in New Orleans, designated in section 1 of Ordinance No. 6695, Administration Series, passed on the ninth day of November, 1880; such line to cross the Mississippi River from a point at or near Westwego to a point on the east bank of the river in front of the Upper City Park, late Foucher property; thence to extend by the best and most

practicable route to the designated terminus, between the new canal, Claiborne canal and Carrollton avenue:

"Now, therefore, for the purpose of securing to the city of New Orleans the advantages that will result from locating and permanently maintaining the terminus of the New Orleans Pacific Railway within the limits of the city of New Orleans, as hereinabove recited:

"Section 1. Be it ordained by the Council of the City of New Orleans, That the New Orleans Pacific Railway Company, or its assigns, be, and are hereby, authorized and empowered to locate and maintain a railroad with all necessary tracks, switches, turnouts, sidings and structures of every kind convenient, useful and appurtenant to said railroad, from such point on the river front as its crossings from Westwego shall be located at in the vicinity of the Upper City Park, along the western border of the said city park, and from thence by the best and most practicable route to its designated terminus east of Carrollton avenue.

"Sec. 2. Be it further ordained, etc., That the city of New Orleans agrees to lease unto the New Orleans Pacific Railway Company, its successors and assigns, for the period of ninety-nine years, and at the price of five hundred dollars per annum, payable annually in advance, all that strip or parcel of ground on the river front of said Upper City Park, south of Tchoupitoulas street, or south of an extension of Tchoupitoulas street, in a westwardly direction, and between a prolongation of the east and west boundary lines of said park to the river, with all the batture formed thereon, or which may form during the term of said lease, with the right to establish and maintain upon said grounds such ferry facilities, wharves, piers, warehouses, yards, tracks, depots, stations, sheds, elevators and other structures as shall be necessary and convenient for the transfer of cars, engines, passengers and freight, and in the transaction of its business. No vessel shall occupy or lie at such wharves without the consent of said company, its successors or assigns, and all vessels lying at or using said wharves with such consent, shall be exempt from the payment of levee or wharf dues to the city of New Orleans; the proceeds of such lease

shall be applied by the city to the improvement of said park.

"SEC. 3. Be it further ordained, etc., That the said New Orleans Pacific Railway Company, its successors and assigns, shall have the right to extend its tracks from the said ground so leased between the Upper City Park and the river front, easterly along said river front to connect with the Belt road at Louisiana avenue, and to connect at Jackson street with tracks heretofore authorized to be constructed between Jackson and Julia streets by section 3 of Ordinance 6695, Administration Series, adopted November 9, 1880, and by Ordinance No. 6732, same series, adopted December 3, 1880, provided that between Louisiana avenue and Jackson street the trains of said company shall be run only between sunset and sunrise on said track, except in case of emergency and necessity beyond the reasonable control of the company.

"SEC. 4. Be it further ordained, etc., That the said New Orleans Pacific Railway Company, its successors and assigns, shall have the right, and the same is hereby conferred for the term of its charter and from and after the expiration of the existing lease of the city wharves, to enclose and occupy for its purposes and uses, that portion of the levee, batture and wharf in the city of New Orleans in front of the riparian property, acquired or to be acquired, between Thalia and Terpsichore streets, and to erect and maintain thereon at its own expense such ferry facilities, wharves, piers, warehouses, elevators, yards, tracks, depots, stations, sheds and other structures as shall be necessary and convenient for the transfer of cars, engines, passengers and freight, and in the transaction of its business. No vessel shall occupy or lie at such wharves without the consent of said company or its successors or assigns, or discharge or receive cargo thereat, and all vessels lying at or using said wharves by such consent and on the business of the company shall be exempt from the payment of levee or wharf dues to the city of New Orleans.

"Said wharves and other structures shall be lighted and policed by said company at its own expense.

"Any vessel lying at these wharves with the consent of the

company, but not on its business, or not for the purpose of discharging or receiving freight or passengers to or from said company as a carrier, shall be liable to the city for usual wharf or levee dues.

"Any vessel using said wharf to receive any freight not coming to or going from said company as a carrier shall pay usual wharfage dues to the city.

"In consideration of the permission herein given the company will build three hundred feet of new wharf at such point between Terpsichore and Jackson streets, for the city, as the administration of commerce may indicate, and will pave Pilie street between Thalia and Terpsichore streets, and Terpsichore street between Pilie and Front with square blocks of granite or with blocks of compressed asphalt, and keep the same in good order.

"The rights conferred by this section shall not be held to interfere with the rights of the city to police any part of the river front.

"Sec. 5. Be it further ordained, etc., That the mayor be, and he is hereby, authorized and directed to enter into a proper notarial contract of lease for the purpose of carrying out the provisions of the second section of this ordinance.

"Sec. 6. Be it further ordained, etc., That the right of way, franchises and privileges herein and heretofore granted to the New Orleans Pacific Railway Company are and were granted on condition and in consideration that the said grantee shall permanently establish its terminus within the city limits, and shall maintain said terminus during the existence of the charter of said company, for which period the said franchises, rights of way, grants and privileges shall last and continue; and should the said railway company, at any time hereafter, remove its terminus from within the city limits, then this grant shall cease and terminate and be without force and effect from the date of such removal; and the further condition that the construction work within the city limits shall be executed under the direction and supervision of the city surveyor, and completed to the satisfaction of the administrator of public improvements and the administrator of commerce; and the

further condition that said railway company shall construct
or control a line of road, ready for public use, from a crossing
of the Mississippi River to its designated terminus in this city,
within two years from the promulgation of this ordinance."

The New Orleans Pacific Railway Company, on June 20,
1881, entered into a written agreement with the Texas and
Pacific Railway Company, a corporation organized under the
laws of the United States, by the terms whereof the New
Orleans Pacific Railway Company consolidated itself with
the Texas and Pacific Railway Company on the terms and
conditions specified in the agreement, "by granting, bargain-
ing, selling," etc., "unto the Texas and Pacific Railway Com-
pany all the franchises, corporate rights or privileges of the
New Orleans Pacific Railway Company, together with its
track, roadbed, buildings, rolling stock, engineer's tools, bonds,
stocks, grants, privileges, property (real and personal) and
every right, title and interest in and to any franchises or
property, real or personal, and all rights of every name and
kind in which the New Orleans Pacific Railway Company
had any right, privilege or interest, situated and being in the
State of Louisiana or in the State of Texas, or elsewhere, it
being declared by the agreement that the object of the agree-
ment was to so merge the rights, powers and privileges of the
New Orleans Pacific Railway Company into the Texas and
Pacific Railway Company that the Texas and Pacific Railway
Company, under its own chartered name and organization
should, without impairing any existing right, exercise in addi-
tion thereto, all the powers, rights, privileges and franchises
and own and control all the properties that the New Orleans
Pacific Railway Company then exercised and owned, or by
its charter and by-laws it had the right to exercise, own or
control."

Thereafter, on July 11, 1882, the City Council adopted
Ordinance No. 7946, as follows:

"An ordinance supplementary to Ordinances 6695, 6732 and
6938, Administration Series, granting certain rights to the
New Orleans Pacific Railway Company and its assigns, and
providing for the selection of a site for the Claiborne market.

" Whereas, by section 2, of Ordinance 6695, Administration Series, a right was given to the New Orleans Pacific Railway Company, or its assigns, to locate, construct and maintain an extension of its railroad through Claiborne street, with a right to construct a passenger depot on the neutral ground of Claiborne street, at or near the intersection of Claiborne street with Canal street, with a proviso that should it become necessary for the building of the depot or laying tracks to remove the Claiborne market, then the New Orleans Pacific Railway Company, or its assigns, should rebuild the same at their own expense on such lots as the city shall designate; and

" Whereas, by Ordinances Nos. 6732 and 6938, Administration Series, certain rights have also been granted to said company and its assigns with reference to the said Claiborne street and to Thalia street, and the company has built its road from Baton Rouge to New Orleans, crossing Thalia street, and established its terminus in the city limits at Thalia street and the levee, and is preparing also to cross from Westwego to the City Park, and thence to Claiborne street; now, therefore,

" Section 1. Be it ordained by the Council of the City of New Orleans, That the Administrator of Improvements, the Administrator of Commerce, and the Administrator of Waterworks and Public Buildings, be, and they are hereby, authorized and directed, within sixty days from the passage of this ordinance, to select such lots as may be needful and proper for a new site for said market; and when such selection shall have been made they shall deposit a proces-verbal thereof in the office of the Administrator of Waterworks and Public Buildings.

" Sec. 2. Be it further ordained, That whenever said company or its assigns shall find it necessary to remove said building it shall be rebuilt on said lots so selected and as prescribed in said original ordinance.

" Sec. 3. Be it further ordained, That in crossing the new canal under its charter, and according to the said ordinances, the said railway company, or its assigns, shall do so by means of a proper drawbridge."

The company also sent its officers with certain city officers in the summer of 1882 to inspect lots thought suitable at that time for the Claiborne market, when the removal of the market might be decided upon; and stated by its officers that the lots would be purchased, the market taken down and another market put up, but that if this was not satisfactory to the city, the city should remain silent for a while, because if it were known the railroad wanted the lots, too much would be asked for them. In the summer of 1883, the company demanded from the city surveyor lines and levels for a track on the river front from Louisiana avenue to Jackson street, and the city surveyor not furnishing them, instituted suit June 11, 1883, in the civil district court for the Parish of Orleans, where the same is still pending, to compel the city surveyor by writ of mandamus to furnish such lines and levels. The company also paid $1000 rent for the two years ending March 8, 1882, and 1883, under an alleged lease of the batture in front of the Upper City Park and made a tender of $500 for rent under said alleged lease for the year ending March, 1884; and acquired by private ownership four squares of ground adjoining the Upper City Park, two squares fronting the river and two in the rear thereof.

The record showed that the railroad company did not establish its terminus in the rear of the city of New Orleans at the place designated by Ordinance 6695 of November 9, 1880, and referred to in Ordinance 6732 of December 3, 1880; that the company did not as stated or required in Ordinance 6938 of March 29, 1881, make its terminus on the west bank of the Mississippi River at Westwego, and there erect its wharves, inclines and structures, necessary for the purpose of crossing the river at that point so as to reach the east bank on the batture in front of the City Park; and that the company did not build its road from the batture along the edge of the park through the designated streets to the point in the rear of the city where the proposed terminus was to be located, under and in accordance with the provisions of the city ordinances, which have already been stated. And the record also disclosed that instead of making Westwego its terminus on

the west bank of the river, the railroad was prolonged nine miles further down the bank of the river to a point designated as Gouldsboro; and this latter point being approximately opposite the foot of Thalia street on the east bank of the river, wharves and inclines were constructed at Gouldsboro, whence the traffic of the road was carried across the river to the foot of Thalia street in the City of New Orleans, where depots and structures have been established by the company.

On the 15th of April, 1884, the City Council adopted an ordinance, No. 685, Council Series, as follows:

" An ordinance repealing certain sections of the Ordinance No. 6938, A. S., granting privileges to the New Orleans Pacific Railway Company.

" Be it ordained, That sec. two (2) of the Ordinance No. 6938, A. S., passed March, 1881, granting to the New Orleans Pacific Railway Company a lease of the Upper City Park batture property, be, and the same is, hereby repealed and revoked."

June 16, 1886, the City Council adopted an ordinance, No. 1828, Council Series, as follows:

" An ordinance repealing certain rights granted to the New Orleans Pacific Railway Company under Ordinance 6695, A. S., adopted November 9, 1880 ; No. 6732, A. S., adopted December 3, 1880 ; No. 6938, adopted March 29, 1881; No. 7946, adopted July 11, 1882; and

" Whereas the city of New Orleans granted to the Pacific Railway Company the right to extend its tracks through Claiborne street to Canal, to erect a passenger depot on Claiborne street near Canal street, construct tracks from Claiborne street to and through Thalia street to the river ; and

" Whereas the original grantee company has merged its identity with that of an alien corporation, which itself is now in the hands of a receiver appointed on the prayer of an alien corporation ; and

" Whereas such rights were granted on various conditions which have not been complied with, and the delay for so doing has elapsed ; and

" Whereas by the acts of said New Orleans Pacific Railway

Company such rights have been abandoned, and it is necessary for the public good that Claiborne street, between Common street and the Old Basin, shall be used for steam and horse railway and depot purposes :

"Therefore, be it ordained by the Council of the City of New Orleans, That all rights of way on Claiborne street, rights to establish a passenger depot on said street, and rights to connect any steam or other railway by the New Orleans Pacific Railway Company through or on Claiborne street, or to erect any depot thereon, whether acquired through or by the ordinances above enumerated or through or by any other ordinance of the council of the city of New Orleans, be and the same are hereby repealed and revoked."

July 2, 1886, the receivers of the Texas and Pacific Railway Company, and the Fidelity Insurance Trust and Safe Deposit Company, filed a bill of complaint in the Circuit Court of the United States for the Eastern District of Louisiana, which alleged the incorporation of the Texas and Pacific Railway Company under certain acts of Congress, the acquisition by the Texas and Pacific Railway Company of all the property and franchises of the New Orleans and Pacific Railway Company, the appointment of receivers of the Texas and Pacific Railway Company, the adoption by the city of New Orleans of Ordinance No. 6695, on November 9, 1880; of Ordinance No. 6732, on December 3, 1880 ; of Ordinance No. 6938, on March 29, 1881; the full and fair compliance by said New Orleans and Pacific Railway Company and the Texas and Pacific Railway Company with the conditions imposed by said ordinances ; the adoption of Ordinance No. 7946 ; the repealing ordinances, No. 685, Council Series, adopted April 24, 1884, and No. 1828, Council Series, adopted June 8, 1886 ; the violation by the adoption of said ordinances of the contract created by Ordinances Nos. 6695, 6732 and 6938, Administration Series, and prayed that Ordinances No. 685 and No. 1828, Council Series, be adjudged and decreed to be illegal and injurious to complainants, and be cancelled, and the right of the Texas and Pacific Railway Company, under Ordinance No. 6695, to lay its tracks and build a passenger depot on the

neutral ground of Claiborne street, near Canal. street, and to remove the Claiborne market, be declared and decreed, and its right to the lands of said park batture, under the second section of Ordinance No. 6938, be declared and decreed; and its right to have lines furnished by the proper official of the city for its route from Louisiana avenue to Jackson street, along the river front, under the third section of said ordinance, be declared and decreed and specifically enforced.

That the city of New Orleans be enjoined and restrained from in anywise executing Ordinance No. 685 and Ordinance No. 1828, Council Series, and from granting to any other person or corporation the rights sought to be taken away by said Ordinances Nos. 685 and 1828.

The city of New Orleans filed its answer, November 1, 1886, which admitted the incorporation of the Texas and Pacific Railway Company; the incorporation of the New Orleans Pacific Railway Company; the contract entered into between the New Orleans Pacific Railway Company and the Texas and Pacific Railway Company, averring, however, the effect of said contract to be that the Texas and Pacific Railway Company was held and bound to all the obligations imposed upon the New Orleans Pacific Railway Company, and was affected by all the equities existing between the New Orleans Pacific Railway Company and the city of New Orleans; the appointment of the receivers; the adoption of Ordinance No. 6695, on the 9th of November, 1880; Ordinance No. 6732, on December 3, 1880; Ordinance No. 6938, on March 29, 1881; the failure on the part of complainants to comply with the obligations imposed by said ordinances; the nullity of the lease of the batture in front of the Upper City Park, purported to be granted by Ordinance No. 6938, and the nullity of the grant of the right to build a depot on the neutral ground of Claiborne street, said batture in front of said park and said neutral ground being dedicated to public use; and the legality of the repealing Ordinances 685 and 1828, Council Series.

On the 3d of February, 1887, complainants filed a supplemental bill, which alleged that under the ordinance set forth in the original bill of complaint, the wharf of the Texas and

Pacific Railway Company, its transfers and incline between Thalia and Terpsichore streets, at New Orleans, had been duly constructed and used for about five years, and in like manner and during the same time the tracks of said railway, connecting its transfer facilities and its depots and sheds at its Thalia street terminus, had been laid and used in Pilie and Water streets, and along the river front from Thalia street up to about Race street; that it had become necessary for the business of said railway to lay a small spur track to connect said wharf above the transfer slip with the said tracks on Pilie and Water streets; that the complainants had applied to the city surveyor for lines and levels of said spur track; that the city surveyor refused to grant said lines and levels under a certain resolution of the council of September 15, 1885, prohibiting him from giving any lines for such work in the street without submitting the question to the council; that said resolution was illegal and a breach of complainants' contract, and that interference by the mayor of the city with complainants' building said spur track was apprehended.

Upon these allegations a writ of injunction was prayed for, restraining the city from interfering with complainants in the work of building said spur track to connect the wharf above the transfer incline between Thalia and Terpsichore streets with the tracks of the railway between Thalia and Water streets, along the river front, and in the work of strengthening and filling up said wharf and driving piling to reach the same with said spur, and for a decree as prayed for in their original bill.

Upon this supplemental bill a restraining order was granted which, by agreement, was to stand as an injunction pending suit.

On the 23d day of June, 1891, a final decree in favor of complainants, granting in full the prayer of their bill, was rendered.

From this decree the city of New Orleans appealed.

*Mr. Samuel L. Gilmore* for appellant.

*Mr. W. W. Howe* for appellee. *Mr. John F. Dillon* was on his brief.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The assignments of error relate to three subjects: First, the batture or space in front of the City Park, embraced in the lease made by the city to the railroad company in execution of the terms of the city ordinance; second, the construction of a track on Claiborne and Canal, and the building on Claiborne near Canal of a passenger depot; and, lastly, the wharfage rights claimed by the railroad company at the foot of Thalia street in virtue of section 4 of Ordinance No. 6938.

The argument as to the first and second assignments is, that the right granted to the railroad company by Ordinances 6695, 6732 and 6938, to extend its track from the point designated as its terminus, in the rear of the city along Claiborne to Canal, and there to build a passenger depot, as also the lease, which, to carry out the ordinance, empowered the railroad company to use the batture in front of the park, and to construct its railroad along the edge thereof through certain designated streets to the rear of the city, were all granted to the railroad company as accessory rights, depending for their existence upon the crossing at Westwego and the location by the railroad company of its terminus in the rear of the city. In other words, that these rights were given to the railroad company, subject to conditions precedent, or to use the language of the law of Louisiana, subject to suspensive conditions. It is further contended: First, that in consequence of the failure of the railroad company to cross at Westwego and to locate its terminus as aforesaid, and its election, on the contrary, to continue its road down the river to Gouldsboro and there cross the river, it never acquired the right to enjoy the privileges above mentioned, and hence that the repealing ordinances are valid. Second, that even if the rights in favor of the company above mentioned were not granted to it on a suspensive condition, they were clearly subject to a resolutory or dissolving condition, arising from the obligation to cross at Westwego and to locate the terminus in the rear of the city at the point designated in the original

ordinance, the contention being that the failure to do so within the period named in the ordinance authorized the city to treat the contract as dissolved and pass the repealing ordinances in question. The railroad company meets these propositions by denying that crossing at Westwego and the location of the terminus in the rear of the city, at the point named in the original ordinance, was made a condition suspending the operation of the grant of the rights above stated, and argues that even if it be conceded that the location of the terminus at the point originally pointed out created a condition, it was not a suspensive but a resolutory one. Although it is admitted that the happening of a resolutory condition dissolves the contract, yet such consequences, it is asserted, do not arise from the mere happening of the condition, and cannot be availed of by one of the contracting parties of his own will, since before the resolutory condition can be invoked it must be established by a suit brought that such condition has arisen and that the effect of its existence has been to dissolve the contract. That is, the claim is that under the law of Louisiana a dissolving or resolutory condition does not operate upon the contract *proprio vigore*, but requires the judgment or decree of a court to give it effect, and that before finding a contract dissolved in consequence of a resolutory condition, the court has the power to obviate the effect of the condition by giving further time to perform the act from which the condition is claimed to have arisen, if, in its judgment, the equities of the case so require.

The question which first arises is, was the right of the railroad company to the property in front of the park and to the track on Claiborne street, including the construction of a passenger depot on Claiborne near Canal, subject to suspensive conditions. The Louisiana Civil Code provides as follows:

"ART. 2021. Conditional obligations are such as are made to depend on an uncertain event. If the obligation is not to take effect until the event happen, it is a suspensive condition; if the obligation takes effect immediately, but is liable to be defeated when the event happens, it is then a resolutory condition.

"ART. 2022. Conditions, whether suspensive or resolutory, are either casual, potestative or mixed."

"ART. 2024. The potestative condition is that which makes the execution of the agreement depend on an event which it is in the power of the one or the other of the contracting parties to bring about or to hinder."

In defining the suspensive condition the Louisiana Code says:

"ART. 2043. The obligation contracted on a suspensive condition, is that which depends, either on a future and uncertain event, or on an event which has actually taken place, without its being yet known to the parties."

These provisions of the Louisiana Code are like those of the Code Napoleon on the same subject. Articles 1168, 1170, 1181.

In *Cornell* v. *Hope Insurance Company*, 3 Martin, N. S. 223, 226, the Supreme Court of Louisiana said, in respect of conditions precedent:

"They are recognized and provided for by our system of jurisprudence, and by every other that has in view the ordinary transactions of men. The obligation is conditional, when it depends on a future or uncertain event, says our Code. The event then must be shown to make the obligation binding on the party against whom it is presented. For until it takes place, he is not bound to perform what he has promised. C. Code, 272, Art. 68. There is an exception to this rule in regard to the dissolving condition. But in relation to all others it is true, and it is a matter of no moment whether we say the obligation is suspended until the condition is performed — or that the performance of the condition must precede the execution of the obligation. C. Code, 274, Art. 81 and 3; Toullier, Droit Civil Francaise, liv. 3, tit. 3, chap. 4, No. 472; Pothier, Traité des Ob., No. 202."

"The effect of a suspensive condition, as its name necessarily implies, is to suspend the obligation until the condition is accomplished or considered as accomplished; till then nothing is due; there is only an expectation that what is undertaken will be due; *pendente conditione nondum debetur sed spes est debitum iri.*" (Pothier, Traité des Ob., 218.)

The suspensive condition under the Louisiana Code is the equivalent of the condition precedent at common law.

The general principles in respect of conditions precedent are set forth sufficiently for the purposes of this case by Chief Justice Shaw in *Mill Dam Foundry* v. *Hovey*, 21 Pick. 440, cited by appellant. Where the undertaking on one side is in terms a condition to the stipulation on the other, that is, where the contract provides for the performance of some act, or the happening of some event, and the obligations of the contract are made to depend on such performance or happening, the conditions are conditions precedent. The reason and sense of the contemplated transaction, as it must have been understood by the parties and is to be collected from the whole contract, determine whether this is so or not; or it may be determined from the nature of the acts to be done and the order in which they must necessarily precede and follow each other in the progress of performance. But when the act of one is not necessary to the act of the other, though it would be convenient, useful or beneficial, yet, as the want of it does not prevent performance, and the loss and inconvenience can be compensated in damages, performance of the one is not a condition precedent to performance by the other. The non-performance on one side must go to the entire substance of the contract and to the whole consideration, so that it may safely be inferred as the intent and just construction of the contract that if the act to be performed on the one side is not done, there is no consideration for the stipulations on the other side. See *Cutter* v. *Powell*, 2 Smith's Leading Cases, 17, and notes.

In examining the contract embodied in the ordinances it is essential to have in mind the particular territory to which the ordinances relate, and we, therefore, insert on page 335 an outline sketch extracted from a map of the city of New Orleans contained in the record.

The original Ordinance 6695 contemplated that the proposed railroad would be built upon the west bank of the Mississippi River, New Orleans being upon the east bank, and that the road would cross that river to the east bank some

hundred or more miles above New Orleans, coming to that city on the east bank, and entering in the rear of the city, that is, in that portion of the city lying a considerable distance back from the river.   The purpose of the ordinance was

clearly indicated by its title, which declared that it was intended to grant " to the New Orleans Pacific Railway Company or its assigns the right to establish its terminus within the city limits and to construct, maintain and operate a railroad

to and from such a terminus, with one extension for passenger purposes and another for freight purposes, into and through certain streets and places in the city of New Orleans." The preamble to the ordinance recited the desire of the railroad to enter the city at about a certain point, and to construct its terminus between the New Canal and Melpomene street, providing the city would grant the right to extend its tracks "*from such terminus* into and through Claiborne street to Canal street for passenger purposes; and shall also grant the right to extend its tracks *from such terminus* north of Claiborne Canal by the most convenient and practicable route through the public streets to the river front for freight purposes." The first section of the ordinance grants the railroad the right to enter the city to the point stated in the preamble, and to construct and maintain at the terminus necessary depots, shops, yards, warehouses and other structures, convenient and useful for the transaction of its business. The point at which the right to construct this terminus was given by the ordinance is embraced within the triangular space in the rear of the city as marked on the sketch above given. The second section of the ordinance empowered the company to "locate, construct and maintain *an extension of* its railroad with all necessary tracks, switches, turnouts, sidings and structures of every kind, convenient and useful and appurtenant to said railroad, . . . into and through Claiborne street to Canal street, with the right to construct a passenger depot at or near the intersection of Claiborne street with Canal street." A glance at the sketch will make clear the fact that Claiborne street thus designated was in the rear of the city, quite near the point where the railroad had contracted to establish its terminus, depots and structures, and that the route thus mapped out in the very nature of things and in the language of the ordinance was a mere right granted to the railroad to *extend* its tracks from the terminus, which the railroad was under the obligation to build, to and along the designated route to the point indicated on Claiborne and Canal. The third section of the ordinance obligated the city to designate a street from the point where the terminus

was selected, and where the company was to establish itself, through which it could build an extension for the purposes of its freight business to the river front. On the face of this ordinance it is apparent that the rights thus given the railroad to extend along Claiborne to Canal for passenger purposes, and along a street to be designated to the river for freight purposes, were mere accessories to the obligation imposed by the ordinance upon the railroad to build its depots, structures, warehouses, etc., at the point indicated, and that the incidental rights of extension from the terminus to the other points could have no existence, if no terminus was established from which the extensions could be made. Reading the provisions of the ordinance with the preamble and the title, it cannot reasonably be controverted that the rights of extension were granted upon the suspensive condition that the railroad should terminate at the point indicated, and there build the shops and depots from which the right to extend its tracks was conceded. And this is, if possible, made more certain by considering the fourth section, which, in express words, provides that the privileges of extension granted were dependent upon the establishment of the terminus at the point indicated, and would cease to exist if, after the establishment of the terminus, the railroad company should abandon it. The language of the fourth section is as follows :

" That the right of way, franchises and privileges herein granted to the New Orleans Pacific Railway Company are granted only on condition and in consideration that the said grantees shall permanently establish the terminus of said road within the city limits, and maintain said terminus during the existence of the charter of said company, for which period said right of way and privileges shall last; and should the said company at any time hereafter abandon its said road on the east side of the Mississippi River and its terminus within the city limits, then this grant shall cease and terminate, and be without force or effect from the date of such abandonment; . . . and it is still made a condition of this grant that said railway company shall complete its road from the crossing of the Mississippi River, at or near Baton Rouge, to

its terminus in this city within two years from the promulga.
tion of this ordinance."

The words "the terminus of said road" and "said termi-
nus" used in this fourth section, clearly refer to the terminus
fixed by the ordinance, and where the railroad agreed to
establish its shops, roundhouses, etc. It follows, then, that
the ordinance granted a right to the railroad company to
enter the city to reach a designated point, and imposed upon
the company the obligation to erect its depots, shops, ware-
houses, etc., at that point; that in consideration of this obli-
gation assumed by the company, to be performed within two
years, a right was given to it to *extend* from the depot so
designated a passenger track to a given point, and a freight
track to another point; that the two rights of extension were
the mere resultants of the principal obligation imposed upon
the company, in consideration of which the rights to the ex-
tensions were conceded; and that the ordinance, in addition,
in order to remove all question that the incidental rights of
extension were dependent upon the principal obligation to
establish a terminus at the point named, provided that, even
after the fixed terminus was established, if it were aban-
doned, the company should cease to enjoy the right of exten-
sion along Claiborne to Canal which the original ordinance
granted. Thus there were plainly created, first, a suspensive,
and, after the work was done, a resolutory condition.

Nor is there anything in Ordinance 6732, adopted on
December 3, 1880, which changed the rights of the parties.
That ordinance reiterated and reasserted the nature of the
privilege covered by the concession made by the previous
ordinance, and designated Thalia street, which is marked on
the sketch, as the one through which the railroad company
should build the track for freight purposes in compliance with
the obligations assumed by it under the first ordinance.

This brings us to the consideration of the ordinance num-
bered 6938, passed in March, 1881. The purpose of that
ordinance, and the change in condition which rendered its
adoption necessary, is stated with great clearness in the pre-
amble thereof:

" Whereas, the New Orleans Pacific Railway Company has purchased the road heretofore constructed under the charter of the New Orleans, Mobile and Texas Railway Company on the west bank of the Mississippi River, beyond Bayou Goula and Westwego, and with a view to maintaining and operating the said road in connection with and as a part of its through line to and from its terminus in New Orleans, designated in section 1 of Ordinance No. 6695, Administration Series, passed on the 9th day of November, 1880; such line to cross the Mississippi River from a point at or near Westwego to a point on the east bank of the river in front of the Upper City Park, late Foucher property; thence to extend by the best and most practicable route to the designated terminus between the New Canal, Claiborne canal and Carrollton avenue :

" Now, therefore, for the purpose of securing to the city of New Orleans, the advantages that will result from locating and permanently maintaining the terminus of the New Orleans Pacific Railway within the limits of the city of New Orleans, as herein above recited."

The ordinance then proceeds in section one to authorize the railroad to maintain wharves, inclines, etc., on the river front at the Upper City Park from such point on the river front " as its crossings" from Westwego shall be located at, and from this point to build a track along the western border of said City Park, and from thence by the best and most practicable route to " its *designated terminus* east of Carrollton avenue."  The second section grants to the railroad land in front of the City Park belonging to the city, on the borders of the river, for the purpose of establishing the crossing of the road as recited in the first section.  The third section gives the company the right to lay certain tracks down the river front, in other words, to connect the newly authorized tracks with those existing at or near Thalia street.  The fourth section granted the company the right to make certain structures at the foot of Thalia street, the point to which the extended freight track referred to in the previous ordinances was to terminate, and at which, as we shall hereafter see, the company actually made its crossing from the west bank, and

where it now maintains its terminal facilities. The rights covered by this section are those to which the third assignment of error relates and are not involved in the inquiry now being pursued. The fifth section authorized the mayor of the city to enter into a contract of lease with the railroad for the piece of ground in front of the City Park referred to in the ordinance, and the sixth section declared that the grant referred to was made upon the condition of the establishment of "its terminus within the city limits."

Referring to the sketch, and considering the record and the terms of this ordinance, the situation was this: The railroad company having obtained a concession from the city of a right to enter the city on the east bank in a particular direction and to build its terminus at a point designated, and having received authority, if it did the foregoing things, to make certain extensions, found it necessary, in consequence of its change of route, to obtain a further consent from the city. The change of line was this: Instead of building its road on the west bank to a point one hundred or more miles above New Orleans, and there crossing the river and coming thence into the city in the rear thereof, as designated in the original ordinance, the company having bought a road on the west bank, the terminus of which was Westwego, about opposite the City Park, asked and was allowed that it be exempted from reaching its designated terminus by entering the city in the rear thereof, and that it be granted the right to establish a crossing from Westwego to the land in front of the City Park, so that from the land thus conceded the railroad might reach the point where it had contracted that it would make its permanent establishment. The argument that this ordinance gave the railroad the power to establish a new or different terminus from that referred to in the original ordinance, because the place where the terminus was to be is referred to indefinitely in the ordinance as between the New Canal, Claiborne canal and Carrollton avenue, is untenable. Indeed the ordinance contains not a word relieving the railroad from the obligation to establish and maintain the terminus indicated in the previous ordinances. On the contrary, the preamble de-

clares that the new route was granted to the railroad to enable it to reach "the designated terminus between the Claiborne canal and Carrollton avenue," which is the situation originally described. It further recites that it is passed for the purpose of enabling the railroad to locate and permanently maintain " the terminus . . . within the limits of the city of New Orleans, *as hereinabove* recited."

In stating the purpose of the grant of the new right of way from the point of landing at the City Park opposite Westwego along the line of the park over the route indicated, the first section in the ordinance declares it to be given to afford the railroad the " most practicable route to its designated terminus east of Carrollton avenue." True it is that in section six, in referring to the previous obligations of the company to establish its terminus, the words used are that the grantee shall permanently establish " its terminus within the city limits." But, manifestly, the words " its terminus " as used there refer to its terminus as defined not only in the ordinance in question but in the prior ordinances by which the grant was made.

It being shown by the record that the terminus from which the extension along Claiborne street to Canal was to be made was never constructed, and that the crossing from Westwego to the land in front of the park was also never established, but, on the contrary, that the company extended its road down the river to Gouldsboro where it made its main crossing, it needs no reasoning to demonstrate that the right to the extension down Claiborne street and the right to the use of the batture in front of the City Park no longer obtains. The claim of the corporation really amounts to this: That, having had certain accessory rights conferred upon it in the event it discharged particular obligations, it can disregard the obligations, escape the burdens resulting therefrom, and yet hold on to all the rights which depended for their existence upon the performance of the obligations which the company has disregarded. The ordinances cannot be properly construed as authorizing an extended track to be built when the point from which the extension was to be made has never come into existence. They cannot be read as dedicating to the use of the

railroad, under the terms of the ordinances, the land in front of the City Park, when such use was accorded to the railroad solely to enable it to accomplish a purpose which it has declined to effectuate by carrying its main crossing to another and a far distant point. In reaching these conclusions we are not unmindful of the argument predicated on the supposed effect of ordinance numbered 7946 A. S. The title of this ordinance indicates its purpose. It is as follows:

" An ordinance supplementary to ordinances 6695, 6732 and 6938, Administration Series, granting certain rights to the New Orleans Pacific Railway Company and its assigns, and providing for the selection of a site for the Claiborne market."

The preamble of this ordinance recites the two ordinances conferring the right to build the extension on Claiborne street and states this right to be one of maintaining " an extension of its railroad through Claiborne street," and after reciting the fact that the railroad had crossed at Thalia street, and established its terminus there, declares that the railroad is preparing also to cross from Westwego to the City Park, and thence to Claiborne street. The ordinance then proceeds to provide for arrangements for removing the market from Claiborne street in order to allow the extension on that street to be built. The argument which is based upon this ordinance is this, that, as at the time this ordinance was passed, the railroad had crossed from Gouldsboro to Thalia street and established its terminus there, as is recited in the ordinance, hence it is asserted the ordinance recognizes the fact that the railroad was entitled to the extension on Claiborne street despite the fact that it had not established its terminus as required by the ordinances from which the right to the extension on Claiborne street arose. But this overlooks the fact that in the very sentence upon which reliance is placed reference is made to the ordinance giving the corporation the right to build from the City Park to the " designated " terminus. One portion of the sentence cannot be separated from the other. The most that can be said of the argument advanced, from the text of this ordinance, is that it seeks by implication and remote deduction to absolve the company from the obligation imposed

upon it when the accessory right of extension down Claiborne street was granted, and thus to enable the company to retain the incidental right, when it had relieved itself of the obligation upon which the right rested. It is not to be doubted that the rule is that contracts are not to be so violently construed as to destroy rights in consequence of suspensive conditions, but it is also equally obvious that they are not to be so interpreted as to relieve one of the parties to a contract from the obligations resulting therefrom and thereby destroy the suspensive condition plainly written therein. Corporations do not take public grants and privileges by implication, and where express and positive obligations are imposed in making a grant, these obligations cannot without violating an elementary canon of interpretation be frittered away in consequence of loose implications made by way of reference in subsequent municipal ordinances. The formal contract of lease executed by the city of the batture in front of the City Park took its origin from and was sanctioned by the ordinance granting the right to cross the river from Westwego to the land covered by the lease in order to enable the corporation to carry its tracks from thence to the terminus which it contracted to establish under the original ordinance. It follows, therefore, that the suspensive condition by which the rights of the company under the original ordinance were held in abeyance operates also upon the lease in question.

The mere payment of rent did not change the nature of the suspensive condition or work an estoppel. The right to use the property was limited to the destination stated in the contract. (La. Civil Code, 2711.) But this right to use was covered by the suspensive condition, and the contract of lease only evidenced the agreement to use the property for the purposes stated, when the suspensive condition ceased to operate by the discharge of the obligations on which it rested, that is, the establishment of the terminus at Westwego, the crossing therefrom, and the location of the shops, etc., at the place fixed in the original ordinance. The case is aptly illustrated by *Roy De L'Ecluse et autres,* Cour de Cassation, 4 Jan. 1858; Journal du Palais, 1858, 452. There a promise to sell on a sus-

pensive condition was entered into, but the prospective buyer was allowed to take possession pending the condition. The claim was that this fact destroyed the suspensive nature of the condition. But the court held to the contrary, considering that the fact of possession was subject to the suspensive condition, as it was upon such condition that the contract had been entered into. Laurent, vol. 17, No. 33, p. 53.

Concluding that the rights on Claiborne street and to the batture in front of the park were subject to suspensive conditions, it is manifest from the facts which we have stated that the railroad company was not entitled to possess or enjoy the same. This renders it unnecessary to consider the resolutory condition and leaves only for consideration the subject-matter of the third assignment of errors. This asserts that the rights conveyed by the fourth section of Ordinance No. 6938 to wharfage, etc., at Thalia street are not validly held by the corporation. This is based not on the claim of a condition either suspensive or resolutory, but because it is asserted that the grant was *ultra vires*. The repealing ordinances, however, do not embrace this grant, and except for the argument at bar it does not appear that the city has repudiated the grant. Since this case was argued a suggestion has been made that this grant has been, in effect, ratified by a provision of a new constitution said to have been recently adopted by the State of Louisiana. As we must reverse the decree rendered for the reasons above stated, we deem that the ends of justice will best be subserved by not passing on this assignment, thus leaving the rights of both parties in relation thereto open for further consideration in the court below.

*Decree reversed and cause remanded for further proceedings consistent with this opinion.*