REGAN, Judge.
Plaintiff, Thomas Jordan, Inc., instituted this suit against the defendant, Raymond Ralph, endeavoring to recover the sum of $450, representing the unpaid purchase price of a steel barge, designated as BJ-242 which the plaintiff sold to the defendant on July 9, 1953 “for scrap, without any warranty as to its condition.”
Defendant pleaded the exceptions of vagueness and no right or cause of action which were overruled. He then answered and admitted that he agreed to buy the barge from plaintiff for $450, but denied that he was indebted unto it for the purchase price thereof since the sale had never been perfected for the reason that it was conditioned upon defendant being able to “cut the barge up for scrap”.
From a judgment in favor of plaintiff as prayed for, defendant has prosecuted this appeal.
Plaintiff, in order to sustain the validity of the allegations of its petition, introduced in evidence the testimony of W. S. Graner, its Marine Superintendent, who stated that the barge was no longer seaworthy[1] and, therefore, it had been beached or moored for about a year on the batture of the Mississippi River near the “Bisso Fleet” at the foot of Walnut Street in the City of New Orleans; the overall measurements of the barge were thirty feet wide, one hundred thirty-five feet long with a draft of eight feet and the value thereof new was about $35,000. He asserted that defendant met him in Peters Road and asked how much the plaintiff wanted for the barge and “I told him the price was $450.00 at * * * Bisso’s Fleet. * * * He agreed to take the barge at that (price)”, and nothing was said about what use would be made of the barge.
However, .on cross-examination Graner modified the foregoing assertions by testifying that since more than two years had elapsed after the sale of the barge he was unable to remember if the defendant told him, at that time, that “he wanted to cut the barge up for scrap.” Graner related that after the sale he met the defendant “on the road” and was told by him that the (U.S.) engineers[2] would not permit “cutting of the barge on the batture” of the river.
James Jacque was the only witness called by the plaintiff and he testified that he had been employed by Captain Billy Bisso for twenty-six years as a watchman for his “fleet”; that part of the barge was in the water and part on the batture “which was controlled by Mr. Bisso” ; [3] he said that he *506 saw defendant twice, “the first time * * * he looked over the barge and told me he had bought * * * or intended to buy it. * * * After * * * a. week more or less, he came back there with two winch trucks and tried to pull the barge on the bank * * * he didn’t have any success so he quit * * * after that I never seen him any more.” Jacque stated that he was not in a position to know what Bisso may have told the defendant with respect to “cutting up the barge for scrap” while it rested on the batture of the river.
Defendant, on the other hand, testified that he had been in the “scrap-iron business since 1933” and that in July of 1953 he met Graner in “Phil’s place in Peters Road” and asked him if he had “anything to sell for scrap” and that he replied that they had a “barge at Bisso’s Fleet that they would take $450.00 for it, so I agreed to purchase the barge if I could cut it up there.” Captain Bisso, Sr. said he could cut the barge up for scrap while it rested on the bat-ture provided I gave him “a couple of bitts for his derrick” which I would salvage from the barge so “I brought my trucks and tied the barge securely * * * and made arrangements to get a crew * * * to cut up the barge” but subsequently W. A. Bisso, Jr., “phoned me and said that I couldn’t cut up this barge, * * * they had too much stuff left and sunk * * Defendant asserted that as soon as he learned that he could not cut the barge upon the batture it had no value for him, “it wouldn’t float and if you would bring it out (on the river) you would be sued by the (U.S.) engineers.” He then informed Graner of Bisso’s refusal to permit him to-“cut the barge up” and he heard “nothing more about it until six or seven weeks later when Tom Jordan[4] told him he would have to pay for the barge. * * * I told him * * * it was a misunderstanding, but rather than have a lawsuit I offered him half of the money for the barge and he turned it down.”
Counsel for the respective litigants concede that the only question posed for our consideration is whether it was the intention of the plaintiff to sell and the defendant to buy the barge conditioned upon the defendant possessing the opportunity to-cut it up for scrap while it rested on the batture of the Mississippi River?
The whole tenor of the record leads us to the inevitable conclusion that the perfection of the contract[5] for the sale of the barge by the plaintiff to the defendant was conditioned [6] upon defendant possessing, at least, the opportunity of cutting it up for scrap while it rested upon the batture. We believe that this condition was expressed[7] when the contract was entered into by the-parties, if not it was certainly implied from the nature of the contract or from the pre *507 sumed intent of the parties. The record ■clearly establishes as a fact that the steel barge was thirty feet wide, one hundred thirty feet long with a draft of eight feet; that it was no longer servicable to the plaintiff — for the reason that it had holes in its sides, therefore, it had been beached on the batture of the river for over a year .and was apparently not capable of being floated. The record likewise establishes as •a fact that Bisso, who possessed the authority [8] refused to permit the defendant to ■cut the barge up for scrap while it rested ■on the batture near the “Bisso Fleet.” The •record shows that plaintiff’s representative, ■Graner, knew that the defendant was en;gaged in the “scrap iron business” and he also knew that the barge was unfit to be used for any purpose except scrap iron as the sale price thereof indicates. When the •sale was made Graner could not, as a reasonable man, have believed that it was the intention of defendant to physically move this tremendous steel barge from the bat-ture to some other location to be cut up for scrap iron. We, therefore, believe that the ■sale was subject to the express condition •of defendant being able to cut the barge up for scrap while it rested on the batture.
This conclusion is additionally substantiated by virtue of the admission appearing in plaintiff’s petition which reads:
“The said barge was no longer serv-icable to petitioner and was purchased by defendant for scrap, without any warranty as to its condition.” (Italics ours.)
This admission in plaintiff’s pleadings is significant in view of the fact that Graner on direct examination testified that at the time of the sale nothing was said about what use would be made of the barge, but on cross-examination he more pertinently stated that since more than two years had elapsed after the sale of the barge he was unable to remember if the defendant told him at that time that “he wanted to cut the barge up for scrap.”
Assuming arguendo that the condition was not express, a view which plaintiff believes to be most favorable to his case, we then are of the opinion that the condition was implied from the nature of the contract and from the reasonable intent of the parties thereto.
For the reasons assigned the judgment appealed from is annulled, avoided and reversed and it is now ordered that there be judgment herein in favor of the defendant dismissing plaintiff’s suit at its cost.
Reversed.

. It had holes in its side and was generally in bad condition.

. Defendant states that it was W. A. Bisso, Jr., who refused him permission to cut the barge up for scrap while it was on the batture of the river, for the reason “that they had too much stuff left and sunk.”

. Italics ours.

. The owner of the barge.

. LSA-Civil Code, Article 2439 provides:
“The contract of sale is an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself.
“Three circumstances concur to the perfection of the contract, to wit: the thing sold, the price and the consent.”

. LSA-Civil Code, Article 2021 provides:
“Conditional obligations are such as are made to depend on an uncertain event. If the obligation is not to take effect until the event happens, it is a suspensive condition; if the obligation takes effect immediately, but is liable to be defeated when the event happens, it is then a resolutory condition.” The “suspensive condition” is the equivalent of the condition precedent at common law, and the “resolutory condition” is the equivalent of the condition subsequent at common law. See City of New Orleans v. Texas & Pac. Ry. Co., 1898, 171 U.S. 312, 18 S.Ct. 875, 43 L.Ed. 179; Godchaux v. Iberia-Vermillion R. Co., 1913, 132 La. 77, 60 So. 1027. It matters not whether the condition was suspensive or resolu-tory since in either event it was not fulfilled, however, it is our opinion that it was resolutory.

.LSA-Civil Code, Article 2026 provides:
“Conditions are either express or implied. They are express, when they appear in the contract; they are implied,, whenever they result from the operation of law, from the nature of the contract, or from the presumed intent of the parties.”’

. This fact stands uncontradicted in the record, and it was further substantiated by the testimony of plaintiff’s witness, Jacque.