FRANCIS A. MORSE & others *vs.* CITY OF BOSTON & others.

Suffolk.    January 11, 1927. — June 29, 1927.

Present: RUGG, C.J., BRALEY, CROSBY, PIERCE, CARROLL, WAIT, & SANDERSON, JJ.

*Contract*, Construction, Consideration, Validity, Modification. *Evidence*, Extrinsic affecting writing. *Boston. Municipal Corporations. Equity Jurisdiction*, Suit by ten taxable inhabitants.

A contract with the city of Boston required the contractor to fill a park area on a shore front. Plans, showing what purported to be the levels of the locus at various points in 1922, were made a part of the contract, which provided for placing upon the land additional filling, thereby raising the entire grade above the levels as they were in 1922 to a grade designated on the contract plans as the finished grade; and the contract provided· "Any material required on account of settlement of the filling or of the underlying material is to be put in place by the contractor at his own expense" and that "the quantity to be paid for shall be determined by measurement of the space filled . . . after the material has been levelled off and rolled." Owing to the soft and unstable character of the substance upon which the fill and loam were to be placed, a large portion of such fill and loam settled below the level of the land as that level existed in 1922. The engineer orally ordered and purported to authorize the contractor to add more loam over areas which had been brought up to grade and had then settled, to be paid for as extras outside the specifications. In a suit under G. L. c. 40, § 53, by ten taxable inhabitants of Boston, it was *held*, that
(1) The words "space filled" in common acceptance could only mean making an empty place full, and, as applied to the contract read

in the light of all the circumstances, meant that the contractor should be paid a sum of money which should be measured by the space filled, rolled off and levelled above the levels of 1922;

(2) There was no patent or latent ambiguity in the quoted terms of the contract, so far as they related to measurements and price to be paid for the work done, which permitted the introduction of parol evidence;

(3) The risk of loss, caused by a part, or even the whole, of the material placed by the contractor upon the 1922 levels sinking below those levels, fell upon the contractor and not upon the city of Boston;

(4) An attempted amendment of the contract to provide for payment to the contractor on a basis of the amount delivered as measured in vehicles less a deduction of ten per cent, even if supported by a good consideration, in the circumstances was void; following *Morse* v. *Boston,* 253 Mass. 247;

(5) Payment to the contractor for material below the levels shown on the 1922 plan was illegal as to the material furnished both before and after the execution of the amendment; but in this proceeding no decree could be made requiring a return by the contractor of sums already paid to him;

(6) The ordering by the engineer of the furnishing of further loam as an extra was a substantial change in the obligations of the contract, and was illegal and void because it created a new right under the contract for the benefit of the contractor which, in its nature, magnitude and expense, did not bear a reasonable subsidiary relation to the work originally covered by the contract;

(7) An injunction was ordered restraining the city from paying to the contractor any further sums under the contract as purported to have been amended.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on October 2, 1924, by thirteen taxable inhabitants of the city of Boston against that city, its mayor, the commissioners of its park department, its treasurer, its auditor, J. C. Coleman and Sons Company and the Maryland Casualty Company, seeking to have declared void certain amendments to a contract made on July 17, 1922, by the commissioners on behalf of the city with the defendant J. C. Coleman and Sons Company, and to have further payments by the city under the contract as amended enjoined and to have the defendant contractor ordered to repay to the city "all sums found to be in excess of what is legally due under the said contract unamended."

After the rescript following the decision reported in 253 Mass. 247, overruling all demurrers to the bill, the suit was referred to a master. Material findings by the master are

stated in the opinion. The suit was reserved by *Pierce*, J., for determination by the full court.

The case was argued at the bar in January, 1927, before *Rugg*, C.J., *Crosby, Pierce, Wait,* & *Sanderson,* JJ., and afterwards was submitted on briefs to all the Justices.

*R. C. Curtis,* (*C. P. Curtis, Jr.,* with him,) for the plaintiffs.

*J. A. Sullivan, S. Silverman,* Assistant Corporation Counsel, & *A. T. Smith,* for the defendants.

PIERCE, J. This is a suit in equity brought by ten taxpayers of the city of Boston, under G. L. c. 40, § 53, to restrain further payments to the defendant J. C. Coleman and Sons Company pursuant to its contract with the city, and to compel that company to repay to the city all sums found to have been paid in excess of what is lawfully due under said contract. The contract in question was executed July 17, 1922, and approved by the mayor July 21, 1922. It was for "completing the Columbus Park Improvement, South Boston, according to the Plans of the Park Department, dated June 24, 1922, entitled 'Columbus Park Improvement, South Boston,' and signed John J. Murphy, Engineer," by filling in the park area, covering about seventy-five acres, up to finished grades as indicated on the contract plans.

In 1916, in order to render the park healthful and desirable as a recreation resort, the city commenced to improve a section of the shore front by eliminating offensive and unsanitary conditions then existing, due to the exposure of the mud flats and sewage at low tide. This project, referred to as the "Strandway Improvement," had been authorized by St. 1914, c. 240. A contract was entered into with the New York State Dredging Company, the general terms of which called for an extension of the existing shore line and the filling in of this territory with what was termed "hydraulic fill," a material of a consistency of about eighty per cent liquid and twenty per cent solid. The dredging company ceased work in 1918 because of the requisition of its hydraulic dredge by the United States Government. Work was not resumed until 1922, when the contract with the Coleman company was made. Plans,

showing what purported to be the levels of the locus at various points in 1922, were made a part of the contract, which provided for placing upon the land additional filling, thereby raising the entire grade above the levels as they were in 1922, to a grade designated on the contract plans of June 24, 1922, as the finished grade. The city's estimate of the cubic yards of earth, gravel, sand and loam required to complete the work was set forth in the contract, and it was also recited therein that this estimate was made for the purpose of comparing proposals and was not guaranteed to be accurate.

The contract with the dredging company contained the following reference to the filling: "Measurements and estimates of the Commissioner will be calculated from the contours of the present surface and the figures of the elevations of the proposed finished surface; and the contractor will be paid only for the cubical contents determined from these figures. Any material required on account of settlement of the filling or of the underlying material is to be put in place by the contractor at his own expense." The contract with the Coleman company, in this respect, provided in item 2 (g) of § 4 of the specifications that "the quantity to be paid for shall be determined by measurement of the space filled . . . after the material has been levelled off and rolled." Items 3 (d) and 4 (d) of § 4 contained similar provisions. An amendment made on August 8, 1924, provided that the quantity of filling was to be determined by the engineer "as measured in the vehicles . . . less a deduction of 10%, and less the amount of excavated material used for filling . . . ." Art. 8 of the contract provided for monthly payments to the contractor based on "the value of materials owned and placed in permanent position on the work by the Contractor," with certain deductions in the final settlement, referred to in art. 9, which settlement was to be made sixty-one days after the work was completed.

It is the contention of the plaintiffs that, under the terms of the original contract with the Coleman company, the latter was to be paid for the material above the levels of 1922 as measured in place; that so measured, the contractor

has been overpaid; that no measurements of the amount in place have been made; and that from the beginning payments have been in accordance with the amount delivered. The plaintiffs further contend that an amendment of the contract made August 8, 1924, constituted a material change; that it was contrary to law and was without consideration. A demurrer of the defendants having been overruled (253 Mass. 247), the case was referred to a master, who has made a report, and the case was reserved for the determination of the full court upon the pleadings, master's report and exceptions thereto.

Item 4 (a) of § 4 of the contract provided in part that "Loam shall be six (6) inches in depth on Playground and eighteen (18) inches in depth for planting areas unless otherwise directed by the Engineer." The Coleman company began work under the contract and proceeded to deliver fill and loam upon the land. The city maintained in daily attendance an inspector with assistants whose duty it was to keep a correct record of the number of cubic yards of filling delivered. The number contained in each motor truck was calculated and a record thereof kept. The chief inspector for the city estimated that five yards was a fair general average per truck, basing this estimate upon the known dimensions of each and the point to which it was filled when he examined it. The master states that he could not find that the five yard estimate was unreasonable. He found that the figures so kept by the city inspector showed that the contractor had delivered 300,476 cubic yards of fill up to May, 1924, and 21,126.5 cubic yards since that date; that 91,028 cubic yards of loam were delivered up to May, 1924, and 504 cubic yards since that time. The city has paid the Coleman company $551,547.38, and is withholding, under the terms of the contract, $29,028.82.

It appears that, owing to the soft and unstable character of the substance upon which the fill and loam were to be placed, a large portion of such fill and loam had settled below the level of the land as that level existed in 1922, when the contract was entered into. Johnson and Watson, a firm of engineers employed originally by the park com-

missioners to determine the amount of material that had been delivered, subsequently were called by the Coleman company to testify to such deliveries. They estimated that there were 191,038 cubic yards of fill above the levels of 1922, from which the master found that 5,327 cubic yards excavated and used as fill should be deducted, as only 988 cubic yards of the total of 6,315 had been deducted by them. They found that 121,852 cubic yards of fill had disappeared beneath the original levels of 1922, which, added to the number of cubic yards found by them to be above these levels, made a total of 307,563 cubic yards delivered by the Coleman company, exclusive of loam. As to the loam, they estimated that there were in all 54,745 cubic yards upon the area, of which 31,150 were below the levels of 1922. The city has allowed the Coleman company for 91,532 cubic yards from which ten per cent must be deducted for measurement in vehicles, leaving a total of 82,378.8 cubic yards of loam delivered, which is over 27,000 cubic yards more than it is entitled to, according to the figures of Johnson and Watson.

The master attributed the difference in the estimates to the failure of these engineers to take into account a mixed soil which contained loam existing below the 1922 levels or to the fact that the loam was subject to erosion. He found that their estimate of the amount of material below the 1922 levels was as nearly accurate as it was possible to determine, and accepted their figure of 121,852 cubic yards as that amount. There was no other evidence of the amount of material delivered which had settled below those levels. Although the testimony of several engineers before the master apparently was conflicting, it appears that nearly all the totals estimated by them were in the vicinity of 300,000 cubic yards of material delivered, if Johnson and Watson's estimate of material below the 1922 levels is added to their estimate above those levels. The master found that the plaintiffs failed to show that the Coleman company had not delivered the number of cubic yards of fill and loam allowed by the city. He found that, by deducting from the total number of cubic yards of fill, as estimated by the city

engineer, the number estimated by Johnson and Watson to be below the 1922 levels, 167,590.25 cubic yards were in place above the 1922 levels. He further found that it was impossible to determine, with any degree of accuracy, the amount of loam above the 1922 levels. Although he accepted the figures of the city engineer for the total amount of loam delivered, he was unable to find the amount of loam above the 1922 levels by subtracting the amount found by Johnson and Watson to be below those levels. He was not satisfied that those figures were sufficiently reliable to form the basis for determining the amount of loam delivered above the 1922 levels.

The "Thirteenth Estimate" which was the last estimate for payment to be made by the park department of the city, and was dated May 22, 1924, is set out in full in the master's report. On the basis of this estimate, it appears that the city has paid all sums due except five per cent of the cost of 260,000 cubic yards of fill and 91,500 cubic yards of loam, which, under the terms of the contract, has been withheld by it.

At the outset the question presented is, whether, under the terms of the original contract, the risk of settlement and loss of material by erosion should be borne by the city or by the Coleman company. The contract provided, in substance, as to the various kinds of material to be delivered, that "the quantity . . . shall be determined by measurement of the space filled . . . after the material has been levelled off and rolled." It is agreed that the contractor was required to deliver and spread fill and loam up to the grade shown on the contract plans. The plaintiffs contend that "space filled" means space filled above the 1922 levels. It is the contention of the Coleman company that "space filled" means all the space filled, whether above or below the 1922 levels, because such space must be filled in order to raise the surface to the desired grade as shown on the contract plans. The provision in regard to measurement according to space filled when leveled and rolled well may have been inserted in the contract merely to relieve the city from paying for material lost by shrinkage due to

leveling and rolling, without intending to place the risk of such loss on the contractor.

If the words used in the contract are plain and free from ambiguity, they must be construed in their usual and ordinary sense; but if they are susceptible of different interpretations and there is doubt, obscurity or uncertainty as to what the parties intended, resort may be had not only to the terms of the contract itself, but also to the circumstances underlying its making. *New York Central Railroad* v. *Stoneman*, 233 Mass. 258, 262. *Snider* v. *Deban*, 249 Mass. 59. *Nelson* v. *Hamlin*, 258 Mass. 331, 340. It is a well settled rule of construction that if the meaning of a written instrument is doubtful and cannot be determined from its language, the instrument will be construed most strongly against the party using the uncertain language and in favor of the one who has been misled by it. *Barney* v. *Newcomb*, 9 Cush. 46, 56. *New York Central Railroad* v. *Stoneman, supra.* In the case at bar the words "space filled" in common acceptance can only mean making an empty place full, and, as applied to the contract read in the light of all the circumstances, mean that the contractor shall be paid a sum of money which shall be measured by the space filled, rolled off and levelled above the levels of 1922. That such construction of these words represents the intention of the parties to the contract is clear from the fact that before the contract was executed the city had prepared plans showing what purported to be the levels at various points in the park in 1922, and they were made part of the contract. These drawings, plans and levels were wholly unnecessary if the words "space filled" are to be so construed that the defendant J. C. Coleman and Sons Company is to be paid under the contract for all material it has delivered at the park whether the filling remains above the 1922 levels or entirely disappears beneath those levels.

There is no patent or latent ambiguity in the quoted terms of the contract, so far as they relate to measurements and price to be paid for the work done, which permits the introduction of parol evidence. The risk of loss because a part or even the whole of the material placed by the contractor

upon the 1922 levels might sink below these levels was one that fell upon the contractor and not upon the city of Boston. "It is a well-settled rule of law, that if a party by his contract charge himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties, however great, will not excuse him." *Dermott* v. *Jones*, 2 Wall. 1, 7. *Adams* v. *Nichols*, 19 Pick. 275. *Boyle* v. *Agawam Canal Co.* 22 Pick. 381. *Rowe* v. *Peabody*, 207 Mass. 226. *Simpson* v. *United States*, 172 U. S. 372. *United States* v. *Spearin*, 248 U. S. 132, 136.

On August 8, 1924, after an investigation of this contract by the finance commission of the city of Boston had begun, the contract was amended by striking out the provisions for payments in the amount of filling and loam measured in place, and inserting therefor provisions that the earth and gravel filling and the loam should be paid for on the basis of the amount delivered as measured in the vehicles less a deduction of ten per cent. This amendment was approved by the defendant mayor, and purports and was intended to apply to filling and payments already completed as well as to future filling and payments. The performance of the contract was incomplete and the work under it was still in progress when this bill and the answers of the defendants thereto were filed. This amendment changed the contract of 1922 in at least the material respects which follow. It eliminated all contention as to whether the city or the contractor had to bear the risk of settlement, and as a legal consequence placed the risks of settlement and erosion from the inception of the contract until its completion upon the city of Boston; and it changed fundamentally the nature and method of ascertaining the amount to be paid the contractor from the rule of the contract to the method prescribed by the amendment.

The facts alleged in the answers and found, in substance, by the master show that the contractor, within its legal right, had refused before August 8, 1924, the date of the amendment, to proceed and complete its contract because

the board of park commissioners had failed and refused to make monthly estimates and payments for filling and loam furnished and for work done, as it was required to do by the contract; that on August 8, 1924, the board of park commissioners for the purpose of securing the completion of the work under the contract offered to make payments for filling and loam furnished by the contractor upon the basis stated in the amendment of August 8, 1924; that this offer was accepted by the contractor and it has continued in performance of the work ever since.

We assume, without discussion, that the above facts, which must be taken to be true, furnish a sufficient legal consideration for the amended agreement. *Torrey* v. *Adams*, 254 Mass. 22, 26. The contract thus made, however, was illegal and void because it did not conform to the requirements of St. 1890, c. 418, § 6, and St. 1909, c. 486, § 30, in reference to advertising for proposals. *Morse* v. *Boston*, 253 Mass. 247. As the amendment to the contract was void and the risks of settlement and of erosion upon the contractor, it is plain the payment to it for material below the levels shown on the 1922 plan was illegal as to the material furnished both before and after the execution of the amendment. The amount of the overpayment need not be determined upon this petition.

G. L. c. 40, § 53, looks to the prevention of expenditures and the incurring of obligations which a town or city has no legal or constitutional right to make or enter into. It does not authorize the correction of wrongs wholly executed and completed; *Fuller* v. *Trustees of Deerfield Academy*, 252 Mass. 258, 260; and except in extraordinary conditions, of which *Frost* v. *Belmont*, 6 Allen, 152, and *Welch* v. *Emerson*, 206 Mass. 129, are illustrations, the statute does not authorize an order for the return of past illegal payments. *Fuller* v. *Trustees of Deerfield Academy, supra.*

The engineer did not have authority verbally to order or authorize the contractor to add more loam over areas which had been brought up to grade and had then settled. The contract provision on loam, item 4 (a) reads: "Loam shall be six (6) inches in depth on Playground and eighteen (18)'

inches in depth for planting areas unless otherwise directed by the Engineer." Sub-paragraph (c) provides: "No loam shall be delivered until the Playground or planting areas are excavated or filled to the required subgrade." The assumed authorization for the placement of loam outside the specifications as an extra was a substantial change in the obligations of the contract, and was illegal and void because it created a new right under the contract for the benefit of the contractor which, in its "nature, magnitude and expense," did not bear a reasonable subsidiary relation to the work originally covered by the contract; *Morse v. Boston, supra;* and was contrary to the statutory requirements, *supra.*

It results that, in the opinion of a majority of the court, a decree should be entered dismissing the bill as against all the defendants other than the city of Boston and the J. C. Coleman and Sons Company; and perpetually enjoining the city of Boston and all officers and agents of the city of Boston from paying directly or indirectly to the defendant J. C. Coleman and Sons Company any further sums of money under the contract of July 17, 1922, as purported to have been amended by the agreement of August 8, 1924.

*Decree accordingly.*