**STATE FUEL CO. v. GULF OIL CORPORATION.**

No. 4443.

United States Court of Appeals First Circuit.

Jan. 18, 1950.

Edmund Burke, Boston, Mass. (Carl H. Amon, Jr., Boston, Mass., with him on the brief), for appellant.

Frank B. Wallis, Boston, Mass. (Harris A. Reynolds, Robert J. Holmes, and Goodwin, Procter & Hoar, Boston, Mass., with him on the brief), for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and McALLISTER, Circuit Judges.

MAGRUDER, Chief Judge.

Gulf Oil Corporation, a Pennsylvania corporation, brought suit in the district court against State Fuel Company, a Massachusetts corporation, on a complaint which, as far as is material at the present stage of the case, alleged that the parties had agreed on a contract for the shipment of kerosene in drums in box cars by Gulf to State; that the costs to be incurred by State in unloading the kerosene so shipped were to be compensated for by the Defense Supplies Corporation (hereinafter DSC)

under provisions of Petroleum Compensatory Adjustments Regulation No. 1, but only up to a maximum of two cents per gallon; that State was to accumulate these costs and "send them to the plaintiff supported by proper evidence for the purpose of being included in the claim" to be filed by Gulf with DSC under the said regulation; that shipments under this agreement were made; and that, State having "sent invoices to the plaintiff for the costs alleged to have been incurred by it in handling and unloading", Gulf filed claim with DSC "in behalf of the defendant for reimbursement", submitted the invoices to Price, Waterhouse & Co., accountants acting for DSC, and informed State that it had credited State's merchandise account with the sum claimed "subject, however, to later adjustment if Price, Waterhouse & Co. audit did not verify the claim in full"; that subsequently DSC in fact allowed only a fraction of State's claim; that Gulf notified State of this action and demanded payment of the difference between the amount claimed by State and previously credited to the latter's account by Gulf, and the amount in fact allowed by DSC; and that State "has neglected and refused to pay said sum of $56,521." Wherefore Gulf demanded judgment against State in that amount together with interest.

State in its answer admitted the contract for the shipment of kerosene by Gulf, the receipt of such kerosene, and that State forwarded to Gulf invoices supporting State's claim for compensable unloading costs, but denied any agreement that Gulf was to act in State's behalf in submitting a claim to DSC, or that State had any rights against DSC. State denied also that Gulf's action in crediting State's account with the full amount claimed by it to represent unloading costs was understood to be subject to any later adjustment, and it professed to have no knowledge of how much of the claim was eventually in fact allowed by DSC. Rather, State alleged, Gulf had unqualifiedly agreed to pay to State any amount claimed by the latter for unloading costs, as long as the claim did not exceed two cents per gallon of kerosene shipped; and further, by way of a separate

defense, State alleged that, even if the contract could be read to bind Gulf to pay State only so much of the costs claimed as would be finally allowed by DSC, Gulf was nevertheless under an obligation to "use all possible means to collect" from DSC any claim forwarded by State, as a "prerequisite" to being reimbursed in the event such a claim was partially disallowed, and that Gulf not only did not discharge this obligation but rather prejudiced State's position as against DSC by summarily settling with the latter without contest.

The case was tried before a jury which returned a verdict for Gulf in the amount prayed for, plus interest. From the judgment entered on this verdict State appeals.

The sizable record before us discloses the circumstances constituting the background of the dealings between these parties. The country in general and the New England area in particular suffered, during the wartime winter of 1942-1943, from an acute shortage of kerosene caused in part by a lack of sufficient tankers and tank cars. The oil industry, mindful of the national interest in effecting an equitable allocation of the scarce fuel supplies available for areas far removed from centers of production, organized a Supply and Distribution Committee to cope with the problem. State was represented on the New England branch of this Committee and in December, 1942, State became aware through its vice president of a plan which the Committee had in contemplation, proposing that kerosene be shipped into this area in drums in box cars. This was an extraordinary method of bringing kerosene to New England, involving substantial additional expense over the more usual methods of shipment, since drums have to be individually unloaded and emptied. What precisely would be the additional cost to be incurred nobody at the time appeared to know, New England concerns having had no experience with unloading drums. Nevertheless the operation was agreed to, albeit reluctantly, under stress of the crisis. The expectation, however, was that the additional cost would be borne by the government, which had in recent months been reimbursing the New England companies for

other extra, wartime costs incurred in shipping oil. And, indeed, on January 14, 1943, Jesse Jones, then Secretary of Commerce, stated officially that Petroleum Compensatory Adjustments Regulation No. 1 (7 F.R. 6993), under which DSC had compensated generally for "Wartime Increases in Costs of Supplying Petroleum and Petroleum Products for Use in Eastern United States", would be amended to provide compensation specifically for shipments in drums in box cars, as recommended by the New England Supply and Distribution Committee. Mr. Jones added that in order to obtain compensation "suppliers will be required to secure, in connection with each such movement, a prior written authorization from the Petroleum Administration for War, approved by Defense Supplies Corporation." Following this announcement, of which State was aware, the Committee formally issued its recommendation. This document, noting that costs were highly uncertain, requested that the companies be guaranteed a *minimum* of two cents per gallon for gasoline shipped in drums *for the first sixty days;* and it recommended that "all charges for drummed kerosene in box cars, which are to be refunded by the Defense Supplies Corporation, be billed to the major oil company".

Pursuant to the, announcement by the Secretary of Commerce, applications were filed by many companies, and they were authorized to make specific shipments in drums. One such authorization, dated January 23, 1943, which is an exhibit in the case, contains the only formula then available indicating how the government would compute compensable extra costs. It recited that upon application by the supplier compensation would be allowed for: "The excess cost at destination, the handling in marketing channels including unloading freight cars, truckage on the drums, unloading at actual point of delivery whether bulk station, retail stores or into consumers' tanks, and returning the empty drums and loading on box cars, in no event to exceed 2¢ per gallon." This formula was, at the time, known to State, which did business with other companies besides Gulf. State's vice president so testified. State

knew, then, that the Committee's recommendation of a *minimum* subsidy of two cents per gallon was not accepted by the government.

Such was the situation, with which both parties were intimately acquainted, when on February 2, 1943, Gulf despatched to State the following telegram: "As per request of Kittinger [of the New England Committee] we are arranging to ship to you five box cars of kerosene in drums at Revere, Massachusetts, delivery to be made by B & M Railroad. Each one of these cars will contain approximately 196 drums. Basis of sale will be on the formula 3⅞ Gulf Coast plus Maritime Commission rate to normal terminal supply point plus three percent transportation tax actually paid on drum movement plus normal freight to destination plus 1½ cents plus tax on return empty drums. Unloading and handling charges to be accumulated by you and bill to us and supported by proper evidence but not to exceed 2 cents per gallon. We have made application for permission to ship these drums as compensable and immediately upon receipt of approval will wire you shipping date. Return drums should be shipped freight collect. You understand all claims for excess cost will be made against DSC by us."

The offer embodied in this telegram was concededly understood and accepted by State. Shortly thereafter, the parties interpreted or clarified the contract by reaching an oral understanding to the effect that Gulf rather than State would bear the burden of financing the costs of unloading while audit and approval by DSC were pending. Shipments of kerosene then started and continued through April 24, 1943. On March 20, 1943, Petroleum Compensatory Adjustments Revised Regulation No. 1, which was forecast in the announcement of the Secretary of Commerce mentioned above, was issued by DSC, effective retroactively as of January 1, 1943 (8 F.R. 6101). It provided specifically for compensation for movements of kerosene in drums and stated that "the amount of the claim shall be computed in accordance with the formula contained in the written request for such movement issued by the Petroleum

Administration for War and approved by Defense Supplies Corporation." This is the formula which we have quoted above. The regulation further stated in § 4(b), under the heading "Final payment of claims", that "Upon receipt of any application it will be referred to accountants who will make such examinations and audits of any books, records and other supporting data as may be necessary to ascertain the facts or as may be required by Defense Supplies Corporation." This subsection applied to *all* compensable movements, and had applied to them before the regulation was revised.

Soon after shipments of kerosene by Gulf to State had started, State commenced sending Gulf invoices representing unloading costs charged to it by M & B Company which, Gulf was informed, did the actual unloading, as an independent contractor, under an agreement with State. These were sent in response to demands from Gulf for "an analysis of cost up to the maximum of 2¢ per gallon" for submission to DSC. State also eventually, though not before a substantial lapse of time during which Gulf continually pressed for more "proper evidence", forwarded to Gulf copies of State's contract with M & B Company. On or shortly after May 29, 1943, more than a month after the last shipment, Gulf, on the basis of the invoices and the contract between State and M & B, credited State's account with the full amount claimed as unloading charges at two cents per gallon.

The aforesaid contract which, with the invoices, was forwarded by State as "proper evidence", purported to have been concluded with one "Morris Bloch, of Winthrop, in the County of Suffolk, doing business under the firm name and style of M & B Company". It had indeed the appearance of an arm's length transaction on the face of it, although in fact, in so far as the record before us indicates, the only "arm's length" provision of it which ever came into operation was State's promise to pay Morris Bloch two cents for every gallon of oil unloaded from drums. What the contract did not show was that Morris Bloch, having been asked as early as December, 1942, by his uncle, Jacob Groman, the treas-

urer of State and a substantial stockholder therein, to undertake the unloading operation with equipment which would be provided by State as needed, and to gather around him some people to help him, formed a partnership with four other men, all related to stockholders and officers of State. It was this partnership, of which Morris Bloch was the managing member, that derived profits under the contract with State, which contract, incidentally, had been drafted by Jacob Bloch, counsel for State, a brother of Morris Bloch, and also a partner in M & B Co. Nor did the contract show that M & B Company used trucks owned by State and driven by employees of State or that it paid State "the going rate" for such use, or that the trucks and men were "rented out" by the hour for 24-hour periods though they were not always engaged in actual unloading during all that time. Nor again did the contract show that M & B's bookkeeper was on the State payroll; or that Morris Bloch's only office was a desk at State's place of business; or that Downing, State's vice president, received from M & B $1100 at the rate of $50 a week "for the things that I can do for you" while the operation was getting started, during "those early pioneering days of unloading"; or that the unloading was performed on a siding which had been obtained and renovated by State under the active supervision of Downing.

In October or November, 1943, Price, Waterhouse & Co., accountants for DSC, began to make inquiries about the nature of the arrangement between State and Morris Bloch, "doing business under the firm name and style of M & B Company". But not until May of 1945 was Price, Waterhouse & Co. able to obtain a letter from State saying very succinctly but, as it happens, inaccurately, that Morris Bloch himself had not been employed by State prior to January 20, 1943, the date of the contract between State and M & B Co. In June, 1945, State, with a great show of cooperation under difficult circumstances, obtained for Price Waterhouse a letter from M & B Co. asserting that the latter's contract with State was an arm's length transaction; that no men employed by M & B in

unloading oil drums were in State's general employ (an inaccuracy); and that no stockholder or officer of State, with the exception of Morris Bloch's brother to whom we have referred above, derived any profits from the operations of M & B Company (another inaccuracy). In October of 1945 Price, Waterhouse and Co. informed State of a new ruling received from Reconstruction Finance Corporation (the successor of DSC) under which only one-half cent per gallon would be allowed to State as unloading costs unless examination by Price Waterhouse of the books of the alleged independent contractor was allowed. We set out in the margin [1] the text of this ruling as it was communicated to State. State, under date of November 14, 1945, wrote to Price Waterhouse that it was unable to obtain M & B records and in fact could make available to Price Waterhouse no information beyond that which it already had supplied. There the matter rested and, Price Waterhouse never having been permitted to see M & B's books, RFC in March, 1946, allowed only one-half cent per gallon as compensation for the cost of unloading kerosene shipped to State in drums. Gulf made informal attempts to get the ruling changed, but without success. It is not apparent what more Gulf could have done in this direction in the face of State's refusal to furnish the supporting data requested by DSC's auditor. We may note at this point that the officer of State who conducted the negotiations with Price Waterhouse was Groman, the treasurer (Morris Bloch's uncle), who admitted at the trial that M & B Company had informed him that "they would give me the books without any recourse to them or without any prejudice." In addition it was a reasonable inference, from the relationship of the parties, that State could have furnished M & B's books if State had wanted to. It is unnecessary to speculate upon why State might have been disinclined to submit M & B's books to scrutiny by DSC's auditor.

On its extensive facts, the case manifestly raises this central question: What was intended or what should rationally have been understood by the parties to be the meaning of a hurriedly reached agreement regarding an eventuality which caused this lawsuit but which was not expressly provided for? In other words, in light of what they did know, had the parties also anticipated specifically that DSC, through its accountants, would make a demand for M & B's books, and that the consequence of the refusal of that demand would be the allowance of only a half-cent per gallon, would they have agreed, and was it the sense of their agreement, that State could withhold the books if it wished, although they were available to it, and that Gulf would take the resultant loss?

A fairly narrow problem of construction is therefore presented. It is not suggested that evidence which shows the circumstances surrounding the making of the contract, and the action of the parties thereunder, is not material and competent on this issue. For it surely is. See Maxwell-Davis, Inc. v. Hooper, 1944, 317 Mass. 149, 152, 57 N.E.2d 537; Tritsch v. Ayer Tanning Co., Inc., 1944, 316 Mass. 598, 602, 56 N.E.2d 11; Atwood v. City of Boston, 1941, 310 Mass. 70, 75, 37 N.E.2d 131; R. H. Stearns Co. v. Anderson, 1939, 304 Mass. 138, 145, 23 N.E.2d 114; Morse v. City of Boston, 1927, 260 Mass. 255, 262, 157 N.E. 523; Schurman v. Improved Plastic-Slate Roofing Co., 1917, 227 Mass. 129, 131, 116 N.E. 530. Terms such as "charges to be accumulated by you and bill

---

1. "1. Where the kerosene is unloaded by another applicant or a company in any way affiliated with it, allowable costs shall be the actual costs incurred by the unloading company.

"2. Where the unloading company is wholly an independent contractor this Corporation will allow, upon review thereof, either the actual charge to the applicant or charges based upon actual cost to the unloading company plus a reasonable profit factor.

"3. Where, pursuant to paragraphs 1 and 2 above, audit to determine actual cost is required and the books of the unloading company are not made available for audit to determine such actual costs, claims should be adjusted to ½¢ per gallon to cover the cost of unloading."

to us", "compensable", "DSC", are not self-explanatory. Nor is it contended that construction of a contract, such as the one here, embodied in Gulf's telegraphic offer, is not generally for the jury under appropriate instructions. See 3 Williston on Contracts, § 616 (Rev. ed. 1936). Compare Davis v. Ames Mfg. Co., 1900, 177 Mass. 54, 58 N.E. 280, with Specialty Trading Co. v. A. C. Erisman Co., 1929, 267 Mass. 220, 166 N.E. 642, and Tuttle v. Metz Co., 1918, 229 Mass. 272, 118 N.E. 291. Cf. Ries v. Dodson, 3 Cir., 1930, 46 F.2d 68, 70; 3 Williston, supra, § 610.

 It is, however, claimed that the court was in error when it admitted, over State's objection, evidence relating to events after May 29, 1943, the date on which Gulf credited State's merchandise account with the sum claimed by the latter for unloading costs; and when it denied State's motion, made at the close of the evidence, for a directed verdict. Neither point is well taken.

The evidence as to events after May 29, 1943, tended to show (1) that State, though able to do so, failed to produce M & B's books as requested by Price Waterhouse, (2) that the result of such failure, under the procedure adopted by DSC in processing claims for compensation, as State was well aware, would be allowance of the claim only in the amount of one-half cent per gallon and disallowance of the balance, and (3) that Gulf, having already credited State in the amount of two cents per gallon for extra unloading costs, and being reimbursed only to the extent of one-half cent per gallon by DSC, thereby suffered a loss of one and one-half cents per gallon. This evidence would have been irrelevant and inadmissible only on the assumption that Gulf, as a matter of law, had undertaken unconditionally to pay on demand any claim by State for unloading costs not exceeding two cents per gallon, even though State might fail to furnish proper evidence to substantiate the application for compensation to be filed with DSC. But as we shall point out more fully below, it could not be concluded as a matter of law that Gulf had assumed any such unconditional

obligation. It was, therefore, not error to admit the evidence in question.

For the same reason, defendant was not entitled to a directed verdict at the close of the evidence on the ground that, as a matter of law, Gulf had assumed the unconditional obligation aforesaid.

 This brings us to the next error assigned by State. It is said to lie in the district court's refusal to grant a motion by State to set aside the verdict and for judgment notwithstanding the verdict or a new trial, on the ground that the verdict was contrary to law and unsupported by the evidence. No objection was taken to any part of the trial court's charge to the jury, and indeed that charge was not included in the record on appeal. We must assume, therefore, that the charge stated the law to the jury correctly, and for that reason, if we conclude that on any permissible view of the evidence the jury could properly have found for Gulf, we must affirm the judgment.

There are at least three interpretations of the evidence which the jury might reasonably have adopted, any of which would sustain the verdict.

First, we think the jury might have found this arrangement: Gulf will ship kerosene to State in a manner which will involve excess unloading costs. It is expected, however, that these will be eventually compensated for by DSC. Since DSC, as a matter of administrative convenience, requires claims for compensation to be filed only by the major oil companies, on behalf of their customers, Gulf agrees to submit to DSC State's claim for compensation (not to exceed two cents per gallon) along with supporting evidence furnished by State. Meanwhile, since Gulf has a running account with State, Gulf is willing to finance State's extra unloading costs while the claim is being processed and audited by DSC. Under this view, Gulf would have an action for money had and received, since it had credited State for more than DSC eventually allowed.

Secondly, the jury might have found a slightly different arrangement, as follows:

Gulf will act, again, as a middleman between State and DSC, and will finance State while the claim is pending before DSC. But, without in any way anticipating what DSC will eventually accept as proper evidence, Gulf will itself require State to supply some form of "proper evidence" before financing State, that is, before crediting State's account in the amount to be claimed for State from DSC. Thus, there would have been a ready explanation of Gulf's evident interest, before crediting State's account, in the furnishing by State of what Gulf might deem, at least *prima facie,* to be "proper evidence" in support of State's claim. Since DSC disallowed a large part of the claim for which Gulf had credited State, Gulf would have an action, under this view also, for money had and received.

However, there is a third permissible interpretation of the arrangement which, though somewhat more favorable to State, was still not sufficient to warrant a directed verdict for the defendant. In this connection it is to be emphasized that the difficulty here arose out of paragraph 3 of the RFC ruling noted above.[2] This is not a case where only M & B Co.'s actual costs without a profit factor were allowed, nor is the dispute here concerned with the amount of the actually incurred costs, or with what a reasonable profit factor should be. DSC in this case allowed only one-half cent because the books of the unloading company (M & B) were not made available to it. They were asked for and State refused to produce them. No one can say how much would have been allowed if DSC could have examined M & B Co.'s books. To sustain the verdict and judgment below, it is not necessary to give such construction to the contract as would save Gulf harmless in the event of disallowance by DSC of State's claim in whole or in part in *any* manner and on *any* ground, which would be the consequence of accepting either of the first two alternative constructions above suggested. It may even be assumed, for the sake of the argument, that Gulf undertook the broad obligation not only to finance

State in the matter of the extra unloading costs but also to assume all risks of the subsequent dealings with DSC, subject only to the condition that State would cooperate in supplying "proper evidence", that is, accurate and complete evidence, to support its claim of compensable extra costs. 1 Am. Law Inst., Restatement of Contracts §§ 254, 258; 3 Williston, supra, §§ 666, 666A, 670, 677. See Atlas Trading Corp. v. S. H. Grossman, Inc., 3 Cir., 1948, 169 F.2d 240; Watson Bros. Transportation Co., Inc. v. Jaffa, 8 Cir., 1944, 143 F.2d 340. That Gulf's undertaking, however broad its terms, was subject to this condition appears, we think, on the face of the contract. Such inference becomes unmistakable in light of the circumstances surrounding the agreement. For it is difficult to see why Gulf would have undertaken the risk of unfavorable action by DSC, except upon such a condition. State could hardly have understood the term "proper evidence" otherwise. The resort to this emergency method of shipping kerosene was upon the initiative of the New England Supply and Distribution Committee, composed of companies like State at this end of the line which had the substantial interest in the matter. Gulf was not suffering from shortage of petroleum or lack of customers. State knew that applications for compensation up to a *maximum* of two cents per gallon would be approved by DSC only after audit, and that the checking of claimed compensable costs might involve examination of an unloading company's books. Under the circumstances, *if it is assumed that* Gulf undertook any risk of unfavorable action by DSC, State could hardly have supposed that Gulf was willing to take a risk which State had the arbitrary power to convert into the certainty of a loss by the simple expedient of withholding from DSC's auditor the books of M & B, the unloading company.

Taking, then, this third permissible view as to the arrangement between the parties, the evidence warranted a finding that the refusal of State to disclose the information reasonably requested by Price Waterhouse

constituted a breach of condition which absolved Gulf from its obligation to take the risk of unfavorable action by DSC. Gulf, having credited State with more than DSC ultimately allowed, was, therefore, entitled to recover the difference from State. Or, to put it another way, Gulf was entitled to recover from State the full amount of the unpaid purchase price for the kerosene sold, minus only so much of the amount theretofore credited by Gulf to State's account as was made good by Gulf's receipt of one-half cent per gallon from DSC.

Other subordinate contentions advanced by appellant have been considered and found to be without merit, but we refrain from discussing them in detail in view of the already too great length of this opinion.

The judgment of the District Court is affirmed.