BAY STATE SMELTING CO., Inc., Defendant, Appellant,

v.

FERRIC INDUSTRIES, INC., Plaintiff, Appellee.

No. 5803.

United States Court of Appeals First Circuit.

June 30, 1961.

Arthur M. Gilman, Boston, Mass., with whom Walter H. McLaughlin, Boston, Mass., was on the brief, for appellant.

Stuart Macmillan, Boston, Mass., with whom Warren G. Reed, Philip H. Suter and Haussermann, Davison & Shattuck, Boston, Mass., were on the brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the District of Massachusetts entered January 6, 1961.

The action was commenced by a complaint filed by Klockner & Company (hereinafter referred to as Klockner),[1] against the defendant-appellant, Bay State Smelting Co., Inc. (hereinafter referred to as Bay State), alleging that Klockner through its authorized agent, Ferric Industries, Inc. (hereinafter referred to as Ferric), entered into five written contracts with Bay State whereby Bay State agreed to provide Klockner with certain quantities of copper, suitably packed in drums, for agreed prices, shipment date to be Jan./Feb. 1955 on one lot (hereinafter referred to as lot #1) and Feb./first half March '55 on the other lots. Klockner further alleged that Bay State attempted to cancel the foregoing contracts without cause by a notice on February 28, 1955 as to lot #1 and notices on March 11, 1955 as to the other lots, and that since that time Bay State has refused to make delivery of the copper in accordance with the contracts.

Klockner alleged that the price of copper has risen since the contracts were entered into and that it has been damaged by Bay State's breach of the contracts. Klockner sought judgment of $10,725 together with interest and costs.

Bay State in its substitute answer denied various material allegations and made further answer that it orally agreed

---

1. In various exhibits and portions of the briefs and record before us the name is spelled "Kloeckner." We use the spelling given in the complaint.

to sell certain quantities of copper for export to Klockner on the condition that Klockner would secure the necessary federal government export licenses during the period prescribed for delivery, and that the copper was to be shipped as it was completed by Bay State at various intervals during the period prescribed in the agreement. Bay State further answered that it completed the material and notified Klockner and requested shipping instructions and evidence of the necessary export licenses, that Klockner did not provide shipping instructions or evidence of necessary export licenses, and was not able to provide the export licenses during the period prescribed for delivery because of a federal government embargo on the material, that Bay State held the material at its plant and when the period prescribed for delivery had elapsed it notified Klockner that it would not sell the material because of Klockner's failure to comply with the terms and conditions of the agreement and further by reason of the contingency provision in the agreement excusing delivery by the seller.

As a second defense Bay State said that the embargo on the copper material remained in effect during the entire period prescribed for delivery, thereby rendering the sale by Bay State to Klockner illegal and excusing Bay State from performance of the agreement.

Ferric made a motion for substitution as party plaintiff or as joint plaintiff on the basis of a written assignment by Klockner of its claim and Ferric's allegation that the contracts referred to in the complaint were executed between Ferric and Bay State, that Ferric is not the agent of Klockner and that Ferric is the real party in interest in this action. The motion was allowed.

A trial was held before a jury. At the completion of the trial Klockner was discontinued as a party plaintiff and a motion for a directed verdict against Klockner was granted. The district court reserved its ruling on Bay State's motion for directed verdict against Ferric. The

case was submitted to the jury for a special verdict on five specific issues:

"1. Did the plaintiff, Ferric Industries, Inc., as principal make contracts with the defendant, Bay State Smelting Co., Inc. to buy the property described in plaintiff's exhibits one to five, inclusive?

*Answer.* Yes.

"2. If your answer to the foregoing interrogatory number one is 'no', did Kloeckner & Co. as principal contract with Bay State Smelting Co., Inc. to buy the property described in plaintiff's exhibits one to five, inclusive?

*Answer.* No answer required. Answer left blank by Jury.

"3. Did the buyer involved in said contracts fail without reasonable cause to take delivery of the said property within a reasonable time after seller was able, ready, and willing to deliver said material pursuant to the contract and buyer was notified thereof?

*Answer.* No.

"4. Was the notice of cancellation of said contracts by the seller on or about March 11, 1955, made before there was any breach of the contract by the buyer?

*Answer.* Yes.

"5. What was the difference between the total contract price of the material described in exhibits one to five inclusive and the market value of said material on or about March 15, 1955?

*Answer.* $7,500."

Bay State urged its motion for directed verdict against Ferric by a memorandum of law filed within ten days of the verdict. The district court denied the motion and ordered entry of judgment in favor of the plaintiff, Ferric, and against the defendant, Bay State, in accordance with the verdict of the jury. Judgment was entered January 6, 1961 and Bay State filed its notice of appeal on January 12, 1961 from the order denying its

motion for directed verdict against Ferric and from the judgment.

On appeal, Bay State contends (1) that the district court erred prejudicially in admitting parol evidence to vary terms of the five written contracts and in submitting to the jury special questions concerning such parol evidence; (2) that the contracts provided for a sale for export and when Klockner failed to secure the necessary export licenses, the performance of the contracts by Bay State would have been unlawful; (3) that the contracts were subject to the condition that the buyer was to secure the necessary export licenses and the failure of the buyer to procure such licenses terminated the contracts; (4) that the cancellation by Bay State on March 11, 1955 of the four contracts calling for March delivery did not deprive Bay State of its right to consider the contracts terminated; (5) that for the reasons in (2), (3) and (4) the district court was required to grant Bay State's motion for a directed verdict as to Ferric.

 We believe that under the standard rules for interpreting contracts, Bay State was excused from performing under the contracts until the buyer, whether it be Ferric or Klockner, secured export licenses and that since no export licenses were obtained within the specific period prescribed for delivery of the materials, nor even within a reasonable time thereafter, Bay State could regard the contracts as terminated and the buyer could not recover for breach of such contracts. We find it unnecessary, therefore, to consider Bay State's other contentions.

One of the "conditions incorporated in and made part of all quotations, contracts and sales" which is printed on the reverse side of the order confirmation sent by Ferric to Bay State is: "The execution of any order is subject to the buyer's ability to secure the necessary Export License." Even if the order confirmation

for each lot is not an integration or partial integration of the agreement between the buyer and seller, there is no doubt that the above condition is part of each agreement. This conclusion is supported by the pleadings and the evidence.

Ferric contends that the export license provision is for the benefit of the buyer only and could be and was waived unilaterally by Ferric.

 We believe, however, that the plain meaning of the provision is that the seller is not required to undertake the execution of any order until all necessary export licenses are available. Under this interpretation of the provision, the condition cannot be said to be included only for the buyer's benefit and thus able to be waived unilaterally by him. We believe that words of the provision are given their natural scope by this interpretation, Hamlen v. Rednalloh Co., 1935, 291 Mass. 119, 197 N.E. 149, 153, 99 A. L.R. 1230; Williston, Contracts § 620 (Rev.Ed.1938); and that even if Ferric's interpretation were as likely, the phrase should be construed against Ferric, the party drawing the order confirmation containing the phrase. See Morse v. City of Boston, 1927, 260 Mass. 255, 262, 157 N.E. 523, 526; Williston, op. cit. § 621.

Although this provision of the agreement would excuse Bay State from making delivery of the scrap until export licenses had been obtained, the right to regard the agreements as terminated would arise only if the buyer failed to obtain export licenses during the time set by the agreements for delivery of the materials. In other words, termination of the agreements would be justified when the failure to obtain the export licenses had materially delayed delivery of the scrap.

 Bay State contends that March 15, 1955 was the last date contemplated by the agreements for delivery of four

lots of scrap and the failure of the buyer to obtain the export licenses by that date permitted Bay State to regard the contracts as terminated. This contention is based on the premise that in the contracts time was of the essence. We do not believe that the practical construction given by the parties to the contracts by their conduct entirely supports this assumption. For example, Bay State wrote letters of availability as to three lots stating the scrap material would be available for shipment "on the week of March 14."

Nevertheless, even if the contracts be construed as not making time of delivery "of the essence," still the buyer must prove that within the reasonable time implied by the contracts, it fulfilled all the conditions precedent to the seller's duty to deliver. The record contains testimony that an export license for forty tons of copper materials was granted to Ferric "around March 23," 1955. We do not believe that this was within a reasonable time of the period specified in the agreements, giving consideration to the fluctuating market involved. Therefore, Ferric cannot recover since it has not satisfied its burden of proving compliance with the terms of the contracts.

■■ Finally, we agree with defendant that although it may have prematurely cancelled certain of the contracts by its notices on March 11, 1955, such cancellations made no difference since the buyer did not change its position in reliance on them and they did not affect plaintiff's efforts to obtain export licenses. Premature repudiation merely excuses subsequent acts which otherwise could have, and presumably would have been performed. See Restatement of Contracts § 306, Comment a; Williston, op. cit. § 698A.

Judgment will be entered vacating the judgment of the district court and remanding the case to that court for entry of judgment for the defendant.

WOODBURY, Chief Judge, concurs in the result.