**Dennis STANDEFER,
Plaintiff–Appellant,**

v.

**Thomas G. THOMPSON, Individually and doing business as Columbus–America Discovery Group, Incorporated, Defendant–Appellee,**

**and**

**John Does 1–10, Defendants.**

**No. 90–2127.**

United States Court of Appeals,
Fourth Circuit.

Argued March 6, 1991.

Decided July 3, 1991.

Robert L. Mills, argued, Rutter & Montagna, Norfolk, Va. (C. Arthur Rutter, Jr., Jesse M. Suit, III, Rutter & Montagna, Norfolk, Va., Tim Murphy, Eureka, Cal., on brief), for plaintiff-appellant.

Robert W. Traffor, argued, Porter, Wright, Morris & Arthur, Columbus, Ohio, Richard T. Robol, argued, Hunton & Williams, Norfolk, Va. (Robert J. Nordstrom, Jean Y. Teteris, William J. Kelly, Jr., Curtis A. Loveland, Porter, Wright, Morris & Arthur, Columbus, Ohio, Robert M. Tate, Philip N. Davey, Hunton & Williams, Norfolk, Va., on brief), for defendant-appellee.

Before WIDENER and WILKINSON, Circuit Judges, and HILL, Senior Circuit Judge of the Court of Appeals for the Eleventh Circuit, sitting by designation.

## OPINION

HILL, Senior Circuit Judge:

Appellant, Dennis Standefer, contends that a preliminary contract entitles him to a share of the wealth produced by the efforts of appellee. The district court concluded that the professed contract never became an enforceable agreement because the parties' contractual obligations were subject to a "condition precedent," the formation of a joint venture with another party, which never materialized. We agree with appellees that an express "condition precedent" governed this contract, and we therefore affirm the judgment of the district court.

## FACTS

### The Shipwreck

An old tragedy and a new discovery have spawned the present litigation. The roots of this lawsuit date to the previous century, when, on August 20, 1857, the Pacific Mail Steamship "Sonora" began the first phase of a fateful journey toward New York.[1] The "Sonora" departed from the port of San Francisco, conveying, as passengers, numerous gold miners together with their cargo of gold. The ship arrived in Panama on September 3, and, on that same afternoon, the passengers, together with the shipment of gold, boarded the steamer "Central America" at Aspenwall for the voyage to New York.

The "Central America" docked in Havana, Cuba on September 7, 1857. After transferring some of its passengers and cargo, the ship sailed for New York on the morning of September 8. By September 12, 1857, however, the "Central America" lay at the bottom of the ocean, felled by the fury of a violent hurricane.

Approximately 336 of the ship's 492 passengers lost their lives. Newspapers and magazines across the country widely reported the news of the ship's disaster, often characterizing the "Central America" as one of the richest ships ever to be lost at sea. One report, in fact, speculated that the ship carried roughly two million dollars worth of gold.[2]

From this sad history we discern the following facts, relevant to the issues we decide today: there is gold beneath the ocean, while above ground there are men who covet it.

During the last decade, appellee, Thomas Thompson, organized the Columbus–Amer-

---

**1.** Since the railroad did not complete construction linking the East and West Coasts until 1869, travel at that time from San Francisco to New York was usually by steamer to Panama, by rail to the port city of Aspenwall, and by steamer from Aspenwall to New York.

**2.** For a complete account of this disaster, see the district court's opinion in the related case of *Columbus–America Discovery Group, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 742 F.Supp. 1327, 1328–29 (E.D.Va.1990).

ica Discovery Group, an organization which prevailed in the race to locate the "Central America," and which has already begun to salvage the sunken ship. Columbus–America's achievement, however, generated not only accolades, but dozens of claims. Nearly thirty insurance companies, Columbia University, and two private individuals have asserted claims to the (as yet still-buried) treasure. Those claims do not concern us. Instead, today we focus only on the single claim of Dennis Standefer, who asserts that the appellee signed a written agreement which obligated him to share with Standefer proceeds from the salvage operation.

### The Preliminary Agreement

Appellant, appellee Thompson, and another individual, John Doering, who is not a party to this litigation, negotiated and signed a preliminary contract on October 7, 1983. The parties, together with Doering, entered the contract in contemplation of the potential salvage operation of the "Central America." The contract, by its terms, assumed that these individuals would form a corporation which, in turn, would establish a joint venture with a fourth individual, Harry John, who would finance the search and salvage procedures. The contract among these three individuals provided terms, conditions, rights, duties and obligations among themselves in the performance of their part in the proposed joint venture with the financier, Harry John, (the "John Joint Venture").

The individuals, however, neither chartered a corporation, nor organized a joint venture. Harry John in fact, never signed either the preliminary contact or the joint venture agreement. Thus the parties failed to implement the very purpose of their agreement, the requisite "John Joint Venture." None of the individuals involved, moreover, ever approved a budget for the joint venture to salvage the shipwreck.

Although the appellant managed to sign the preliminary agreement, he did nothing further after the collapse of the proposed joint venture. In fact, he participated in *none* of these following ways:

(1) he did not enter in the management and timing of the salvage operations;

(2) he never assisted in the selection of contractors, suppliers or equipment;

(3) he did not aid in plans for the salvage's disposal;

(4) he did not help interpret the accumulated research and data;

(5) he did not help locate the wreck by use of either vessels or scientific equipment;

(6) he did not assist in formulating a budget or in presenting any accounting to the project's financial backers.

On November 30, 1983, a federal Grand Jury indicted the appellant on ten counts of mail fraud (which, although unrelated to the present endeavor, emanated from appellant's activities vis-a-vis another joint venture treasure hunt). The district court subsequently permitted appellant to plead guilty to one of those counts. On August 2, 1984, the court imposed probation terms that prohibited Standefer from engaging "in any joint ventures, limited partnerships, or solicitation of funds for ventures or projects."

### ISSUES

Standefer now challenges the district court's interpretation of the preliminary agreement. The district court concluded that the establishment of the John Joint Venture constituted a "condition precedent" to the agreement; it also concluded that the agreement required appellant to participate substantially, if not equally, with Thompson in the joint venture. Finally, the district court concluded both that the parties mutually abandoned the agreement, and that Standefer's inability to perform—the result of the terms of his probation—excused Thompson's obligations under the contract.

### DISCUSSION

Both parties agree that they entered into the agreement in contemplation of the search and salvage operation; both also agree that, as consideration, they would have accepted the mutual exchange of information and research necessary to locate and recover the artifacts and treasure.

Appellee, however, contends that Standefer cannot enforce the contract; he asserts that the parties signed the agreement only on the condition that they would create the John Joint Venture, a venture that never materialized.

### The John Joint Venture

The preliminary agreement signed by the parties states in pertinent part:

> It is agreed that a corporation ... will be formed between Thomas Thompson, Dennis Standefer and John Doering.... The objective of forming the [corporation] is to carry out the duties of the [Columbus–America] Group *under the joint venture with Mr. John.*

(Emphasis supplied.)

■ ■ Appellant now contends that since the preliminary agreement contained no words or phrases such as "if," "provided that," "when," "after," "as soon as," or "subject to," that traditionally indicate conditions, we may not construe the establishment of a formal John Joint Venture as an actual condition precedent. Most courts and commentators agree, however, that catch phrases, although helpful, are unnecessary to create a condition:

> No particular form of words is necessary to create an express condition. Whether a promise is conditional, and if so what is the nature of the condition, depend upon interpretation.

■ 5 *Williston on Contracts*, § 671, p. 160 (1961), *citing State Fuel Co. v. Gulf Oil Corp.*, 179 F.2d 390 (1st Cir.1950). *See also Restatement (Second) of Contracts*, § 225 (1981). Although we agree with the appellant that the law generally does not favor conditions precedent, we may certainly construe a contract as conditional if its plain language compels us to do so. *Hubler Rentals, Inc. v. Roadway Express, Inc.* 637 F.2d 257, 262, n. 2 (4th Cir.1981) (Hoffman, J., dissenting in part). *See also New Orleans v. Texas & P.R. Co.*, 171 U.S. 312, 334, 18 S.Ct. 875, 883, 43 L.Ed. 178 (1898).

In the instant case, virtually every substantive paragraph of the preliminary agreement refers to the John Joint Venture. Even the title of the preliminary agreement, "Re: Joint Venture with Harry John of Milwaukee, WI for salvage of Central America and other wrecked vessels," exemplifies the profound significance of the John Venture to the contracting parties. In fact, the second paragraph of the preliminary agreement states that the very purpose of the corporation established by the agreement was to carry out the obligations of Thompson, Standefer, and Doering, "under the joint venture with Mr. John." In our view, this language unambiguously establishes the formation of the John Joint Venture as a precondition to the enforcement of this contract.

■ Appellant nonetheless contends that the language of the preliminary contract supports his claim for enforcement of the agreement since, he asserts, the contract anticipated that one party might proceed with salvage operations without the participation of the others. Although the agreement expressly addresses the formation of a corporation for a joint venture, the language of that agreement also supplies the grounds which form the basis of appellant's challenge:

> If the John Venture *discontinues* its Central American operations for any reason whatsoever, the [corporation] formed by the paries [sic] shall retain the [Columbus–America] Group's interest in any information or materials developed on any wrecked vessels during any completed or partially completed phase of the Central America operation. Thereafter, no party shall proceed to salvage the Central America ... for a period of ten (10) years....

> If a party does proceed to salvage the Central America ... without the other parties during such ten (10) year period, *the nonparticipating parties shall still receive the same share of the salvage from operations such non-participating parties would have received had they participated.*

(Emphasis supplied.) Appellant now contends that since he "performed historical research relating to the location of the SS Central America before and after the signing of the October 7, 1983 contract," he somehow established, or activated, the joint venture. In our view, his argument is at

odds with the plain language of his agreement.

The John Joint Venture makes clear that Harry John was to provide *all* of the substantial funds needed to finance the salvage of the sunken ship.[3] Although appellant, arguably, may have discharged some or all of his obligations under the preliminary agreement, John neither undertook nor discharged *any* of the obligations of a joint venturer. John, in fact, never *signed* the joint venture, and he certainly never funded a salvage operation. Appellant's behavior alone could not trigger the operation of the venture; the venture required funding from John, and that funding never materialized.

From these facts we must conclude that the John Joint Venture, together with the funding from John that the venture by necessity implied, became the condition precedent which determined the enforcement of the preliminary agreement. Since the parties never organized this joint venture, *a fortiori*, they were unable to discontinue the project; a venture must start before it can stop. We also note that since the very purpose of the proposed venture (and by extension, the preliminary agreement), was to obtain funding from John, Standefer's conduct, standing alone, could hardly generate the circumstances necessary for the contract's enforcement.

### CONCLUSION

We note that the appellee has offered other grounds by which we might affirm the judgment of the district court. Since this ground alone suffices, we need not consider these alternative theories today. We therefore affirm the judgment of the district court.

AFFIRMED.

---

3. Excerpts from the proposed John Joint Venture include the following indicative phrases: (1) "John will be responsible for funding the phases of the joint venture;" (2) "the required funds for phase one and two shall be deposited by John in a bank or money market account designated in writing by the CA Group;" (3) "John shall deposit the funds necessary for phase three in the same account established for the first two phases;" (4) "John shall deposit the funds necessary for phase four into the account established to hold all funds for the operation," and (5) "John shall deposit the amount necessary to make up such insufficiency in the account."